UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-60727 - CIV - DIMITROULEAS

ROBERTO MARTINEZ, as court-appointed
Receiver of MUTUAL BENEFITS CORP.,
VIATICAL SERVICES, INC., and VIATICAL
BENEFACTORS, LLC,

       Plaintiff,

vs.

SPEAR SAFER CPAs & ADVISORS, a
Florida Limited Liability Company,

       Defendant.
_____/

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE
SCOTT M. BOUCHNER'S EXPERT TESTIMONY AND
EXPERT REPORT AND MEMORANDUM OF LAW IN SUPPORT**

The Defendant, SPEAR SAFER CPAs & ADVISORS ("Spear Safer"), hereby files this Motion In Limine To Exclude Scott M. Bouchner's Expert Testimony and Expert Report. In support of Spear Safer's Motion, it states as follows:

**INTRODUCTION AND FACTUAL BACKGROUND**

As the Court is aware, the above captioned proceeding is a professional negligence action brought by the Receiver of Mutual Benefits Corp. ("MBC") against Spear Safer, an accounting firm that conducted audits of MBC's financial statements between 1994 and 2003. Throughout the pendency of this case and to date, there have been absolutely no allegations that Spear Safer, in the performance of its auditing responsibilities, was involved in or in any way aided and abetted the allegedly fraudulent activities of MBC's officers, directors, sales personnel and outside consultants. Instead, the Receiver's alleged "negligence" claim against Spear Safer is at its core based solely

upon the alleged duties assumed by Spear Safer in conducting its audits of MBC. Despite this fact, that is the complete absence of even the allegation of fraudulent conduct on the part of Spear Safer, the Receiver's damages expert, Scott Bouchner, as made clear in both his expert report and his recently taken deposition, has calculated the Receiver's damages to range between $136.4 million to $484.8 million. This amount is calculated as the amount equal to the cumulative investments in viatical policies brokered by MBC, net of any investor recovery, which sum represents, according to Mr. Bouchner, liabilities now owed by MBC to investors through May 4, 2004, which was the date that MBC was placed into receivership. Mr. Bouchner has admitted that these damage calculations, based upon the net investment of MBC's investors, are duplicative of and overlapping with the alleged securities fraud damages claimed as owed to MBC's investors for MBC's own alleged fraudulent activities. [See Deposition Excerpt of Scott Bouchner dated June 4. 2007, p. 3, 76-77].[1]

Defendants herein seek exclusion of any testimony from the Receiver's damages expert, Scott M. Bouchner,[2] for two primary reasons: (1) The underlying assumptions that Mr. Bouchner's

---

[1] Also pending is Spear Safer's Motion for Summary Judgment and Supporting Memorandum of Law which argues that the Receiver is not authorized by Judge Moreno's Order Appointing Receiver to pursue this negligence action, that in *pari delicto* principles bar this action, that the Receiver's "regulatory intervention" causation theory is grounded upon shear speculation and contradicted by known history relating to MBC, and that a so-called deepening insolvency or artificially prolonged corporate life theory will not lie, as a matter of law, when only a negligence cause of action is brought against the defendant. [DE 31, 50].

[2] Scott Bouchner is not a CPA, but rather is a forensic valuation analyst. [See Deposition Excerpt of Scott Bouchner dated June 4. 2007, p. 51; Curriculum Vitae of Scott Bouchner attached to his Expert Report]. According to his Curriculum Vitae, Mr. Bouchner is a Director in Forensic and Business Valuation Services with Berkowitz, Dick, Pollack & Brant. In terms of his education background, Mr, Bouchner received a B.A. degree in English Literature from the George Washington University in 1987 and an MBA degree in Finance/Marketing from Columbia Business School in 1990. [See Curriculum Vitae of Scott Boucher attached to his Expert Report].

damages calculations are based upon are exceedingly speculative and not supported by the facts in this case, thus, his opinions are unreliable and inadmissible; and (2) the underlying damages calculations fail to take into account the issue of loss causation and are derived from a fatally flawed methodology. Spear Safer therefore respectfully requests that the Court strike Mr. Bouchner's report and testimony and preclude him from testifying at trial on grounds that his opinions are legally unsound and are not based upon sound methodology.

In support of this Motion, Spear Safer is relying upon the Expert Report of Scott M. Bouchner dated May 21, 2007 as well as a Deposition Excerpt of Scott Bouchner dated June 4, 2007, both of which are being filed with the Court through a contemporaneously filed Notice of Filing in Support of Spear Safer's Motion In Limine To Exclude Scott M. Bouchner's Expert Testimony and Expert Report.

## LEGAL STANDARD

The Federal Rules of Evidence assign to the trial judge the gatekeeper task of ensuring that an expert's testimony, whether scientific or non-scientific, rests on a reliable foundation and is relevant to the task at hand. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 148-49 (1999); Corwin v. Walt Disney World Co., 475 F.3d 1239, 1250 (11th Cir. 2007). In determining the admissibility of expert testimony under Federal Rule of Evidence 702, a district court in the Eleventh Circuit must conduct "a rigorous" three-part inquiry" considering whether: (1) the expert is qualified to testify competently regarding the matters intended to be addressed; (2) the methodology used to reach conclusions is sufficiently reliable, as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in

issue. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998).

When there has been an objection to the opinion of an expert witness, the Court is obligated to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" Daubert, 509 U.S. at 592-93. A district court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. General Electric Company v. Joiner, 522 U.S. 136, 146 (1997). The party offering the expert bears the burden of laying the proper foundation for the admission of expert testimony and must prove the admissibility by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir.1999). The Daubert requirement that the expert testify to scientific knowledge with conclusions supported by good grounds for each step of the required analysis means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1245 (11th Cir. 2005). In this case, Spear Safer respectfully submits that the Receiver has not and cannot meet is burden to show the necessary predicate and foundation to permit the admission of Scott Bouchner's testimony at trial.

## ARGUMENT

**I. BOUCHNER'S OPINION ON THE RECEIVER'S DAMAGES, FOUNDED ENTIRELY UPON THE SPECULATION THAT MBC WOULD HAVE EITHER BEEN UNABLE TO CONTINUE TO OPERATE OR WOULD HAVE HAD ITS OPERATIONS SIGNIFICANTLY CURTAILED IN THE ABSENCE OF A SPEAR SAFER UNQUALIFIED AUDIT OPINION, MUST BE EXCLUDED.[3]**

---

[3] The deposition of the Receiver's liability expert, John Young, was recently taken although a transcript from this deposition is not yet available. While Mr. Young's opinions do not appear to

As repeatedly stated within Bouchner's report and deposition, his opinion on damages rests on numerous assumptions including that Spear Safer committed professional malpractice in performing its audits of MBC; that had this assumed malpractice not occurred, Spear Safer would not have been able to issue unqualified audit opinions for MBC, and that without the unqualified audit opinions, MBC would have either been unable to continue to operate or MBC's operations would have been significantly curtailed. [DE 44-2 at p. 3]. Another critical link within this chain of speculation, purportedly supporting Bouchner's opinion, is the assumption the Receiver will be able to prove at trial that, without unqualified audit opinions, MBC would have been unable to continue to operate or that its operations would have been significantly curtailed. [DE 44-2 at p. 2]. This assumption, and the promise of later factual proof, is premised on the belief that regulatory authorities, including the Florida Department of Insurance, would have promptly stepped in and shut MBC down thereby preventing additional investment into MBC. As summarized by Bouchner, the sequence of assumptions is that "had this been uncovered early on, [MBC's alleged fraudulent activities] had they not had audited financial statements provided to the regulatory bodies that required them, had they disclosed the fact that they were unable to obtain licenses for those states that required them, there would have been ramifications to the business which would have either prevent [sic.] it from continuing to operate or at least changed it in such a dramatic fashion that [MBC] would have essentially not been able to generate the type of revenue and investments that

---

be based on a primary underlying assumption that had Spear Safer not issued financial statement audit opinions, then MBC would not have been able to conduct business, as are Mr. Bouchner's, to the extent that the Receiver would seek to obtain testimony at trial from Mr. Young which is based on this flawed assumption, Spear Safer would seek to exclude such testimony based upon the same grounds laid in Point I of this motion.

they did."[4] [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, pp. 40-41]. This "regulatory policing" argument, essential to Bouchner's opinion on causation and the resulting damages, is nothing more than a series of guesses, speculations, and suppositions. Indeed, the unsupported fact that third-party regulators would swoop in due to the absence of a Spear Safer audit and shut down MBC, mirrors the hackneyed plot device of a *deus ex machina*.

There is simply no evidence to support that the regulators would have acted in the manner supposed by Bouchner. Indeed, the true facts show that ongoing regulatory investigations were already well under way prior to the time that the Receiver posits that Spear Safer should have become aware of the issues with MBC, but that the regulators continued to allow MBC to operate and did not stop or curtail MBC's operations until years later despite regulator's knowledge that something may be suspect. Thus, the true facts are contrary to the underlying assumption upon which Bouchner's damages opinions are based. Accordingly, his opinions are invalid and should be excluded.

The Supreme Court has stated that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. This court can and should conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Expert testimony should generally be excluded if it is purely speculative or conjectural. See e.g., McLean v. 988011 Ontario Ltd., 224 F.3d 797, 800-01 (6th Cir.2000) ("an expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and

---

[4] In spite of the fact that Bouchner repeatedly references the fall back position of damages arising from a "curtailment" of MBC's business, he candidly admits that he has done no analysis on this measure. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, at p. 40].

should be supported by 'good grounds,' based on what is known.... An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.") (quotations omitted); Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1072-73 (6th Cir.1999)(affirming trial court's decision in a CERCLA case to strike proposed expert's affidavit as based on "speculation, conjecture, and possibility" and affirming trial court's holding that the "inadequate factual basis" made the proposed expert's affidavit "scientifically unreliable").  "A district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir.1996).

As the above citations to black letter law show, this Court may exclude testimony that is the product of speculation or conjecture.  The test for admission of expert testimony requires a three part analysis under Rule 702 considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998)).

Of the three prong test detailed above, this section of the Motion covers the basis for excluding Bouchner's opinion under one and three.  The application of Daubert is included within Section II of this Motion.  Thus, that basis for excluding Bouchner's opinion under Daubert will not be repeated here.

Within the first part of the test established by Frazier, this Court in U.S. v. Masferrer, 367

F.Supp.2d 1365, 1372 (S.D. Fla. 2005) has stated:

> The observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. Frazier, 387 F.3d at 1261. While an expert's overwhelming qualifications may bear on reliability of his proffered testimony, they are by no means a guarantor of reliability ... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341-42 (11th Cir.2003). "Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility." Frazier, 387 F.3d at 1261.
>
> The trial court's gatekeeping function requires more than simply taking the expert's word for it. (Footnote omitted).

Here, the Receiver has not produced an expert that offers a reliable opinion. In fact, Bouchner not only asks that the fact-finder take his "word for it" on the supposed impact of regulatory intervention as the basis for his calculation of damage, but also that the fact-finder take the word of unidentified witnesses who will later supply the necessary facts or regulatory intervention. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, p. 34]. In fact, as stated above, there is absolutely no evidence to support the underlying assumption that there would have been immediate regulatory intervention had Spear Safer acted in the manner that the Receiver claims that it should.

Within part three of the test established by Frazier this Court, in Masferrer, also evaluates whether expert testimony will assist the trier of fact, subjecting speculative testimony to critical evaluation. Indeed, the "admission of speculative and potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702." Masferrer at 1374 (citing Hull v. Merck & Co., Inc., 785 F.2d 1474, 1477 (11th Cir. 1985).

Equally important is that it is the Receiver's burden to prove in this negligence based action

that Spear Safer's alleged breach of duty was both an actual and a proximate cause of the Receiver's injury. In this instance, Bouchner purportedly supplies the necessary causal link between the alleged negligence and the damages based upon the as yet produced trial testimony. However, Bouchner's conclusions on causation must have a basis in established fact and cannot be premised on mere suppositions, even if based on assumed facts, there must be some support for the assumptions within the record. McLean, 224 F.3d at 801. (Citation omitted). The necessary facts are absent and even the speculations upon which Bouchner relies cannot be called assumptions based within the record. Therefore, his opinions should be excluded. See Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996) (excluding testimony of economic expert who assumed contrary to the party's prior work history that party would be employed full time with fringe benefits for the remainder of his career); Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983) (remanding case where expert was permitted to testify regarding estimates of future earnings which were based upon unsupported supposition that party would have worked past the age of 65 and would have received fringe benefits where there was no evidence that party had ever received fringe benefits). Thus, the failure to support Bouchner's damages opinions with facts to support the underlying assumptions on which the opinions are based requires that it be excluded.

     Recall that Bouchner's entire opinion relating to causation and the resulting damages is based on the speculation that outside regulators would have promptly prevented MBC from continued operation or caused an interruption in MBC's business. [See Deposition Excerpt on Scott Bouchner dated June 4, 2007, pp. 40-41]. This speculative assertion is not grounded in either record fact or a valid assumption. Specifically, in the State of Florida, viatical settlement providers were not even required to provide audited financial statements as part of their annual report until 2005.

See Ch. 2005-237, §16, Laws of Florida (amending section 626.9913, Fla. Stat.). Further, there is nothing to suggest that "but for" the Spear Safer audits that MBC would not have been able to continue its alleged misdeeds. This is particularly true as MBC was being investigated by the Florida Department of Insurance, Insurance Fraud Division, for a substantial period of time prior to the period of damages claimed. See State v. Viatical Services, 741 So.2d 560 (Fla. 4th DCA 1999). Clearly, the specter of misdeeds of MBC triggering a fraud investigation from regulators occurred independent of and prior to any activity of Spear Safer. Consequently, the "regulatory policing" theory breaks down to nothing more than unsupported speculation underlying Bouchner's opinion on damages.[5]

In his Expert Report, Mr. Bouchner has posited a separate damages theory labeled the"Related Party Payment Based Damages," which he estimates produces a damage range between $39.7 million and $49.6 million. Under the Related Party Payment Based Damages theory, Bouchner posits that an appropriate measure of damages could be the amount of profit that was taken out of MBC by the principals as a result of the transactions. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, pp. 81]. In his deposition, Bouchner admits that the two different damages theories ("Net Investment Based Damages" vs. "Related Party Based Damages") are alternative theories and that the Receiver would not be entitled to damages under both theories. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, pp. 80-81]. According to Mr. Bouchner,

---

[5]In the initial and the reply memoranda supporting Spear Safer's pending Motion for Summary Judgment [DE 31, 50], we specifically argued that the Receiver's "regulatory intervention" theory of causation was based upon sheer speculation, and indeed, that the theory contradicted the historical facts concerning how regulatory agencies were already investigating and dealing directly with MBC and its outside attorneys throughout the entire relevant time period without shutting them down.

he believes that the net investment based theory is a correct measure of damages, but has included the related party payment theory of damages as "an alternative in the event that it was deemed by the trier of fact that the [net based investment theory] wasn't an appropriate measure." [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, pp. 80-81].

In this case, Spear Safer respectfully submits that neither of the alternative damages theories put forth by Scott Bouchner are appropriate measures of damages in a professional malpractice action and therefore, contrary to the opinion expressed in his deposition, the Receiver is not entitled to place either theory, much less both theories, before the jury. While Spear Safer's objections to the Net Investment Based Damages theory are laid out in detail below, it should be pointed out that the Related Party Payment Based Damages theory is also objectionable since, as argued above in more detail, it is based on invalid and factually unsupported underlying assumptions regarding causation that are too speculative to be considered by the jury. See e.g., Coopers & Lybrand v. Trustees of the Archdiocese of St. Petersburg Health & Welfare Plan, 536 So. 2d 278, 282 (Fla. 3d DCA 1989) (accountant's liability for malpractice and failing to discover defalcations or fraud was limited to losses proximately resulting from accountant's breach of duty and therefore accounting firm that negligently failed to discover the lack of insurance due to another party's theft of premium funds could not be charged with benefit payments which might have been covered had a policy been in force since policy coverage was merely speculative); see also Gertler v. Sol Masch & Co., 835 N.Y.S.2d 178, 179 (N.Y.A.D. 1st Dept. 2007) (rejecting plaintiff's experts damages theory in an accountant malpractice case that was based on assumptions and speculation as to what plaintiff might have done had the malpractice not taken place); ESCA Corp. v. KPMG Peat Marwick, 939 P.2d 1228, 1233-1234 (finding proof of damages in an accountant malpractice case to be speculative

and self-serving at best).  Consequently, both of Mr. Bouchner's damages theories are fatally flawed and must be therefore be stricken.

>   **II.   BECAUSE THE NATURE OF THE RECEIVER'S ALLEGED DAMAGES, AS ASSERTED BY SCOTT BOUCHNER UNDER HIS NET INVESTMENT BASED DAMAGES THEORY ARE IN ACTUALITY, SECURITIES FRAUD DAMAGES, THE RECEIVER IS REQUIRED, AS A MATTER OF LAW, TO PROVE THE ELEMENT OF LOSS CAUSATION, WHICH MUST BE ESTABLISHED THROUGH THE USE OF AN EVENT STUDY OR OTHER SIMILAR ANALYSIS**

As explained on page 2 and again on page 8 in his expert report and also throughout his deposition, Scott Bouchner has opined that the damages resulting from Spear Safer's alleged professional negligence are equal to the cumulative investments in viatical policies brokered by MBC, net of any investor recovery, which sum represents, according to Mr. Bouchner, liabilities now owed by MBC to investors through May 4, 2004, which was the date that MBC was placed into receivership.  According to Mr. Bouchner, this net investment based theory of damage assumes that investors will assert and collect on their securities fraud claims against MBC in the amount equal to their initial investment net of any recovery.  Thus, although the Receiver's claim against Spear Safer sounds in negligence as a professional malpractice cause of action, the damages that are actually being sought by the Receiver against Spear Safer in this case, as articulated by Scott Bouchner, are  damages for the securities fraud that was allegedly perpetrated by MBC against its investors.[6]  According to the Receiver, Spear Safer should be liable for all of the damages that would

---

[6]As argued in Spear Safer's recently filed Motion for Summary Judgment [DE 31], which is currently pending before the Court, the Receiver does not have standing to seek to recoup monies that are actually owed to MBC's investors.  As recognized by Judge Moreno in his Order of Dismissal in the Receiver's action against the sales agents of MBC. [*Martinez v. Dave Traina, et al.* Case #05-60906], as commendable as the Receiver's efforts to try to protect MBC's investors

be owed to MBC's investors as a result of the securities fraud engaged in by MBC's officers, directors, sales personnel and the outside consultants because, according to the Receiver's speculation, "but for" Spear Safer's accounting malpractice, MBC would have been shut down years earlier thereby precluding these damages from being incurred by the investors. The measure of damages that the Receiver seeks to put before the jury at trial through the testimony of Scott Bouchner is flawed, as a matter of law, since it fails to take into account the issue of loss causation as required by the Supreme Court in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005). In In re Teco Energy, Inc. Securities Litigation, 2006 WL 845161, *2 (M.D. Fla. 2006), Judge Whittemore sets forth the applicable standard under Dura:

> [T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.' Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir.2005) (internal quotations and citation omitted)....In Dura, the U.S. Supreme Court held that loss causation may not be established by simply alleging a stock was purchased at an artificially inflated price. Dura Pharm., 125 S.Ct. at 1631-32, 1634.

Likewise, the Eleventh Circuit has also discussed the loss causation requirement. In Robbins v. Koger Properties, Inc., 116 F.3d 1441 (11 Cir.1997), the court stated:

> To prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss. If the investment decision is induced by misstatements or omissions that

---

may be, he lacks statutory standing under the federal securities laws to do so. Spear Safer respectfully submits that the Receiver's efforts here to recover federal securities fraud damages that would be owed to MBC's investors under the guise of a professional malpractice claim is especially misplaced and unsound since there is no evidence and no allegations have ever been made that Spear Safer engaged in any conduct that violates federal securities laws. Nonetheless, the Receiver, Scott Bouchner's damages analysis, is seeking to hold Spear Safer liable for all of the damages that are allegedly due to MBC's investors as a result of MBC's alleged fraud.

>are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery ... is not permitted. In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss. Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause. Id. at1447 (internal quotations and citations omitted).

In the recently decided case of Morgan Stanley & Co., Inc. v. Coleman (Parent) Holdings Inc., 32 Fla. L. Weekly D773a (Fla. 4th DCA 2007), the Fourth District Court of Appeal, in reversing a judgment in excess of $1 billion on grounds that the plaintiff had failed to prove damages as required by Dura, recognized that as a general rule, plaintiffs seeking to prove securities fraud rely on expert proof to establish both the fact of damage and the appropriate method of calculation. In doing so, the court explained that in order to recover in a securities case, it "require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong." See also Miller v. Asensio & Co., 364 F.3d 223, 232 (4th Cir 2004) (quoting from In re Executive Telecard, Ltd. Sec. Litig., 979 F.Supp. 1021, 1025 (S.D.N.Y.1997)).

Moreover, with respect to the issue of proving loss causation, the Morgan Stanley court explained that "Usually, a securities plaintiff proves the actual, or "fraud-free," value of the stock at the time of purchase by presenting an expert "event study" or "event analysis" and that, in fact, an "event analysis" is often required to support an expert's damages calculation, which "generally involves the computation of a statistical regression analysis or, at a minimum, the compilation of a detailed analysis of each particular event that might have influenced the stock price." Id. (Citing to Miller, 364 F.3d at 234).

Because of the need "to distinguish between the fraud-related and non-fraud related

influences of the stock's price behavior," In re Oracle Sec. Litig., 829 F.Supp. 1176, 1181 (N.D.Cal.1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar. See, e.g., Gordon Partners v. Blumenthal, 2007 WL 431864 (S.D.N.Y. 2007) (granting summary judgment in favor of defendant where plaintiff's damages expert failed to conduct an event study or any similar analysis and therefore plaintiff's efforts to simply recover the entire price that they paid for the stock was legally improper); Carpe v. Aquila, Inc., No. 02-088-CV, 2005 WL 1138833 at *3-4 (W.D. Mo. 2005)(recognizing that the accepted means of distinguishing between fraud-related and non-fraud-related changes in a stock's behavior is an event study and excluding the damages testimony of plaintiff's expert where it failed to take any market forces into account in his calculation of plaintiff's loss); In re Northern Telecom Ltd. Sec. Litig., 116 F.Supp.2d 446, 460 (S.D.N.Y.2000) ("Torkelson's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert."); Executive Telecard, 979 F.Supp. at 1024-26 (finding an expert's methodology not reliable because he failed to conduct an event study or regression analysis to detect whether stock price declines were the result of forces other than the alleged fraud; applying Daubert to exclude the expert damages report); Oracle, 829 F.Supp. at 1181 ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendant allegedly have distorted. . . As a result of his failure to employ such a study, the results reached by [plaintiffs' expert] cannot be evaluated by standard measures of statistical significance.").

In In re Imperial Credit Industries, Inc. Sec. Litig., 252 F.Supp.2d 1005 (C.D. Cal. 2003),

the district court excluded an expert's report pursuant to Daubert and Federal Rule of Evidence 702, on the ground that the methodology was flawed insofar as the expert failed to differentiate between fraud-related and non-fraud related influences of the stock's behavior and thus was invalid since the court could not conclude that the expert opinion rested on a "reliable basis in the knowledge and experience of expert's discipline."

The importance and centrality of the event study methodology in determining damages in securities cases-and the propriety of rejecting expert damages reports which do not use such a methodology-has been conceded by plaintiffs in other securities fraud cases:

> "[A]ccording to [plaintiffs], the methodology- 'event study methodology '-used to calculate shareholder damages during the class period 'has been used by financial economists since 1969 as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.' .... It is so accepted, plaintiffs add, that courts now reject expert damage estimates which do not use event study methodology to evaluate the impact on the market of a company's disclosures."

In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 235, 253-54 (D.N.J.2000).

Scott Bouchner's damages analysis is legally unsound and must be stricken because, by his own admission, his analysis does not take into consideration the issue of loss causation as required by Dura and, in doing so, fails to make any adjustment for market, industry, or company specific factors that were effecting MBC's price during the relevant time period, which were unrelated to MBC's alleged fraud. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, p. 3, 79-80]. When asked during his deposition about an event study, and in particular, whether he considered that there could have been other factors that may have affected or reduced the value of the asset other than MBC's alleged fraudulent misrepresentation, Mr. Bouchner, although admitting that it was possible that other factors could have affected the value of the asset aside from MBC's alleged fraud,

stated that he did not do " . . any analysis that tried to differentiate the value between the various factors. . " that affected the asset's value. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, p. 79-80].  Mr Bouchner was asked during his deposition whether he would agree that some alleged investor losses, especially those dealing with AIDS policies, could have had simply to do with the investment being worth less because of the advances that had been made with AIDS treatment, to which he responded that it was possible that this factor could have been a factor in certain patients living beyond their life expectancy thereby decreasing the value of the investment. [See Deposition Excerpt of Scott Bouchner dated June 4, 2007, p. 78-79].  Despite acknowledging this fact, however, he admitted he had not factored this analysis into the his damages calculations. As such, his damages methodology is legally unsound and fatally flawed.

Quite simply, Scott Bouchner's net investment theory of damages is contrary to law, as set out in Dura, and, as such, is premised upon a legally improper measure of damages.  By failing to conduct an event study or any other type of similar analysis and therefore failing to undertake the requisite methodology to allow a fact finder to determine which portion of the loss was attributable to MBC's alleged fraud and which was not, Mr. Bouchner's opinion with respect to the Receiver's alleged damages is invalid. As such, it cannot and should not be presented to the jury.

## CONCLUSION

Based upon the facts, and the reasoning and citations of authority set forth above, Spear Safer respectfully requests that this Court enter an Order In Limine Excluding Scott M. Bouchner's Testimony and Expert Report and for such further relief that the Court deems appropriate.

    Respectfully submitted,

    __/s/ Peter H. Murphy_____

> Peter H. Murphy, Esq. (FBN 201431)
> KUBICKI DRAPER, P.A.
> City National Bank Building, PH
> 25 West Flagler Street
> Miami, Florida 33130
> Direct Line: (305) 982-6711
> Facsimile: (305) 374-7846

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on <u>June, __, 2007</u> I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM-ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By:  <u>/s/ Peter H. Murphy</u>

**SERVICE LIST**

Curtis Miner, Esq.
Colson Hicks Eidson
255 Aragon Avenue, Second Floor
Coral Gables, FL 33134-5008.
Phone: (305) 476-7400
Facsimile: (305) 476-7444
[Counsel for the Receiver]