# Copy

```
 1        (Excerpt of the Deposition of Scott Bouchner

 2   taken June 4, 2007.  In Re:  Martinez v. Spear

 3   Safer)

 4        *           *           *           *           *

 5                  AFTERNOON SESSION

 6              DIRECT EXAMINATION CONTINUED

 7   BY MR. MURPHY:

 8        Q    I am going to be asking questions now in

 9   connection with your capacity as the receiver's

10   damages expert, okay?

11        A    Okay.

12        Q    Some of the questions obviously will

13   assume some of the information I already asked you

14   and I might be asking you to repeat some of them

15   just for the basis of the answer.

16        A    Okay.

17        Q    Would you agree that the actions of the

18   Steingers and Steiner, Mr. Steiner and Mr. Lombardi

19   also damaged MBC?

20        A    Yes.

21        Q    And the actions of Dr. Mitchell you would

22   certainly agree damaged MBC?

23        A    Yes.

24        Q    And Carol Trainer and Barry Wiggins who

25   pled guilty also to knowledge of fraud, whatever
```

Martinez vs. Spear

1    they did, that would have damaged MBC, correct?

2         A    Abolutely.

3         Q    Have you determined or have you ever been

4    asked to determine by the receiver damages that

5    might have been caused MBC by any of those

6    individuals I mentioned?

7         A    No.

8         Q    Would you agree that for the damages, and

9    I'm kind of paraphrasing now, and I'm going to get

10   into the analysis of this, but in essence the

11   damages that you have opined have been caused by the

12   alleged actions of Spear Safer have to do with

13   investments made, purchasers investment money made

14   either after one of two times, either 1997 or 1999,

15   depending on the regulatory window you want to use,

16   right?  The net monies paid by investors after that

17   time.

18        A    That was one of the two alternatives.

19        Q    Right, and had two alternatives and I will

20   not ask you about the other one yet.

21        A    Okay.

22        Q    How much if any of those alleged investor

23   losses after that date can be attributed if you know

24   to the actions of Lombardi, the Steingers, and

25   Steiner, and those other individuals that I

Martinez vs. Spear

```
 1   mentioned?
 2        A    I have not performed any analysis of -- I
 3   haven't attributed damages to those individuals.
 4        Q    Could that be done?  Is that something
 5   that could be done along the same lines as the
 6   analysis that you made with regard to Spears Safer?
 7        A    Yes.
 8        Q    And it wouldn't be a duplication of
 9   damages or would it?
10        A    They would be overlapping.
11        Q    You've already told me that you have never
12   given any opinions whether qualified, unqualified,
13   going concern, or anything like that, correct?
14        A    With regards to Mutual Benefits or any
15   case?
16        Q    Regarding any case.
17        A    No, I have not.
18        Q    Even though you haven't do you know
19   whether in giving a qualified opinion or not giving
20   an unqualified opinion can have any delitorious or
21   detrimental effects on a corporation if it's not
22   correct?
23        A    Would giving a qualified opinion have a
24   delitorious effect if it is not correct?
25        Q    On an operation of a corporation.
```

1          MR. MINER:  Objection.  You're talking in
2     general, not MBC specific?
3     Q     In general.
4     A     It would depend on the nature of the
5 qualification.
6     Q     But depending on certain circumstances, I
7 mean, a company could go out of business,
8 shareholders could lose money, and basically what I
9 am getting at would you agree, and maybe you can,
10 maybe you can't, that that type of an opinion should
11 not be given lightly?
12    A     I don't think any opinion should be given
13 lightly.
14    Q     Mr. Young has given opinions that deal
15 with the liability aspects of the case, correct?
16    A     That's correct.
17    Q     And as I understand it he gave opinions in
18 a very lengthy, I think a 60-page report, with
19 regard to the alleged audit failures on behalf of
20 Spears Safer in addition to a general discussion of
21 the liability aspects of the case, right?
22    A     That's right.
23    Q     And you have been retained to provide an
24 analysis or opinion as to the alleged damages caused
25 by the alleged audit failures on behalf of Spear

```
 1   Safer?
 2       A    That's right.
 3       Q    Were you the individual who was also
 4   retained to give an opinion as to the cause of those
 5   damages?
 6       A    No, I have not.
 7       Q    You understand there is a difference
 8   between fault and liability?  You have done this
 9   before in other cases, right?
10       A    Yes.
11       Q    You understand there is a difference
12   between fault and liability, the amount of the
13   damages and connecting up the alleged fault with
14   those damages, correct?
15       A    Yes.
16       Q    Now, who in this case has determined the
17   cause or connection between the alleged losses on
18   the alleged damages incurred by MBC with the actions
19   of Spear Safer?
20       A    That will be proven in court by the
21   receiver.
22       Q    Not by you or Mr. Young?
23       A    I'm not testifying to the causation and
24   when we say causation, I have certain inherent
25   assumptions in my damage claim.  Primarily being
```

1    that there would have been a regulatory response,
2    and certainly I have investigated the reasonableness
3    of the receiver's position on that, but I'm not
4    opining as to, you know, what the regulatory
5    response would have been.
6            Mr. Young is testifying to the standard of
7    care and to liability issues, but neither of us will
8    be specifically testifying to the regulatory
9    response results from those issues.
10       Q    But in the sense that you have been asked
11   to assume certain things, you are expressing an
12   opinion as to causation assuming certain things are
13   correct, right?
14           MR. MINER:  Objection.  I think it
15       mischaracterizes his answer.
16       A    No, I think that I'm calculating damages
17   based on certain assumptions.  That doesn't mean
18   that I'm taking responsibility for those
19   assumptions, but that I'm assuming that they will be
20   proven at trial in order for my testimony to be
21   relevant.
22       Q    Are there any other expert opinions with
23   regard to liability that you are relying upon other
24   than what is set forth in Mr. Young's report?
25       A    I think that there was one additional area

1   that I'm relying on which I think was implied in

2   Mr. Young's report, but based on my reading of

3   Mr. Haugh's report, it may have been misinterpreted.

4          Mr. Young has testified that Spear Safer's

5   audits were not conducted in accordance with

6   generally accepted auditing standards and the

7   financial statements were not prepared in accordance

8   with generally accepted accounting principles.

9          And as a result, Mr. Young will be

10  testifying and opining that those financial

11  statements, the unqualified statements that were

12  signed by Spear Safer, could not have been done.

13         Now, that was probably not brought out as

14  explicitly as perhaps it could have been, but

15  certainly all of my discussions with Mr. Young are

16  very much on point with that, and that is certainly

17  his opinion which you will be able to certainly

18  discuss with him and I'm assuming that he will be

19  able to prove that up.

20      Q    Well, are there any other opinions that

21  have been expressed by Mr. Young that you know of

22  that have not been expressed by him in that 60-page

23  report that he issued?

24      A    Just what I had said.  I didn't see a

25  specific -- certainly he implied and referred that

1    there would have been problems offering an

2    unqualified opinion or any opinion at all for that

3    matter, but it's not as specifically worded as

4    perhaps it could have been and I'm saying that that

5    is an opinion of his.

6         Q    You would agree, though, in that report

7    Mr. Young does not say anywhere that as a result of

8    these alleged failures on behalf of Spear Safer that

9    a qualified report or any sort of unqualified or any

10   sort of non-unqualified report could be given.

11   Would you agree?

12        A    I don't want to put words in Mr. Young's

13   mouth, but ---

14        Q    I'm saying in the report.  I'm not asking

15   you to put words in his mouth.  I'm saying you read

16   the report.

17        A    Yes, I read the report.

18        Q    Is there anything where he says -- gives

19   any statement as to the fact that had Spear Safer

20   done what he says they should have done that this

21   would have resulted in an opinion that would not

22   have been an unqualified report?

23        A    Certainly as I said we've discussed that

24   both before and after the issuance of his report and

25   that is his opinion, but it was not as explicitly

1  worded as it perhaps could have been.

2       Q    Well, do you know where in the report

3  there was even implicitly worded anything about the

4  type of opinion that would have had to be given?

5       A    Well, there were references to some

6  authoratative literature that discusses qualified

7  and unqualified opinions, I think.

8            Again, I would rather you ask Mr. Young

9  than me, but I think it goes without saying that if

10 you don't have an audit conducted in accordance with

11 GAAS, financial statements in accordance with GAAP,

12 you can't have an unqualified audit opinion, and I

13 know that his opinion is that it would not have been

14 possible to issue any opinion on these financial

15 statements given the issues inherent in the case.

16      Q    By the way, when did you have this

17 conversation with him about ---

18      A    Like I said, it was -- we have had these

19 conversations before and after.  It was always -- it

20 wasn't until reading Mr. Haugh's report that it even

21 became an issue that -- that the language wasn't

22 there, but it was always implied.

23      Q    Did Mr. Young tell you in discussing with

24 him what sort of audit opinion, assuming Spear Safer

25 did what he says they should have done, would have

Martinez vs. Spear

```
1    been issued in this case?
2         A    I believe when you discuss the case --
3    when you take Mr. Young's deposition, he will tell
4    you that it would not have been possible to issue an
5    opinion qualified or otherwise because of issues
6    dealing with management integrity, the scheme that
7    was perpetrated by the related parties and once you
8    lose trust in management and you can't -- there was
9    such an inherent problem with the company that any
10   opinion would have been impossible.
11        Q    Any opinion about their financial
12   statements?
13        A    I believe what Mr. Young would testify to,
14   and you would have to confirm this with Mr. Young --
15        Q    I'm going to ask him.
16        A    -- but I think what you are going to find
17   when you discuss this with him is that he does not
18   believe it would have been possible for an auditor
19   to issue an opinion on financial statements that
20   arose as a result of -- that were prepared in
21   connection with a company that was involved in a
22   fraud to the extent of Mutual Benefits.
23        Q    Was there fraud, did he tell you, in the
24   financial statements themselves?
25        A    There was fraud inherent in the entire
```

1   business which would have impacted all of the

2   financial statements.

3        Q    But I'm just talking about the financial

4   statements themselves.  Was there fraud, did he tell

5   you, inherent in the presentation of the financial

6   statements themselves, the statements as opposed to

7   the business that led to them?

8        A    Our conversation really revolved around

9   the business model that generated sales that were

10  fraudulently obtained and consequently if your sales

11  are fraudulent and management is perpetuating a

12  fraud, then you can't sign an audit opinion

13  qualified or otherwise.

14       Q    And did he tell you that that was

15  basically because of the fraudulent life

16  expectancies?

17       A    That certainly would have been a major

18  factor.

19       Q    And is it also implicit in his report that

20  the main -- the gravamen of what is being stated as

21  to the result of the fraud was an underestimating of

22  premium liabilities on the books of MBC?

23       A    No.

24       Q    What did he tell you was the gravamen of

25  what the fraud produced?

Martinez vs. Spear

1      A     MBC was involved in selling viatical

2   policies that initially were one- to three-year life

3   expectancy, then they increased it to four, five

4   years and I think at the very end there were a

5   couple of six-year policies, and your question

6   presupposes that if the life expectancy was

7   calculated correctly, the reserve could have been on

8   the books, but when you've got people who are now

9   ten years or more beyond life expectancy, and many

10  of these people have no possibility of dying any

11  time in the near future, to be graphic, it's not a

12  matter of just establishing a large reserve.  It's

13  whether you even have a viatical policy itself.

14        The only thing that converted these

15  policies from something of no value other than

16  possibly their cash value, to one that had value

17  that could be sold was a life expectancy estimate.

18        I can buy a policy and pay a premium and

19  that premium reflects what the -- without a

20  shortened life expectancy, that there is no value in

21  that policy unless I'm building cash in it.

22        However, if all of a sudden my thousand

23  dollar a year premium is being paid by a million

24  dollars of coverage, it's now determined that I got

25  a condition and that I am going to die in two years,

1    now there's value.

2              Otherwise, it's just a policy that anybody

3    can acquire at no -- there's no premium.  There is

4    no reason to buy it.  So if their entire operation

5    was based on selling something that wasn't what was

6    represented to be, it's not an issue of just

7    figuring out what the right life expectancy is.

8              When you have that type of a situation, it

9    is not a matter of making audit adjustments or

10   issuing a qualified opinion.  I believe Mr. Young

11   will testify the only option for an auditor at that

12   point essentially is to walk away.

13        Q    So what Mr. Young has told you is that in

14   view of what he believes and in view of what the

15   alleged audit failures of Spear Safer was is that

16   that would have led them to actually walk away and

17   not issue an opinion.  Is that what I understand you

18   to say?

19        A    Essentially.

20        Q    That is, he didn't tell you that they

21   would have issued a qualified opinion.  He didn't

22   tell you that they would have issued a going concern

23   opinion.  He didn't tell you that they would have

24   issued an adverse opinion.  What you recall him --

25   what you say he told you was is that they could not

Martinez vs. Spear

```
1    have issued any opinion whatsoever?
2         A    Yeah, I think that's right.
3         Q    And that would have been what, when they
4    first audited the financials for '94, '95 and that
5    would be the position he would take based on what he
6    told you as of 1997?
7         A    Again, I would rather let Mr. Young talk
8    for himself.
9         Q    I'm just asking you.
10        A    You know, that is the general -- that's
11   what Mr. Young explained to me and what his feelings
12   were.
13             Now, I don't think he has a specific time
14   frame -- he's not saying that in 1995 this
15   absolutely would have happened.  I believe he has
16   concerns or problems with the audit going back from
17   day one.  But certainly over time, and this is where
18   I -- this is where my opinion comes in, I have
19   looked at what type of information would have been
20   available to Spear Safer.  Mr. Young has looked at
21   what information they relied on, what they did, what
22   procedures were performed by Spear Safer.
23             But what I have done and what I have
24   qualified in my analysis is is I looked at what the
25   situation was specifically with the MBC policies,
```

Martinez vs. Spear

1   but also with all of the policies, and I looked at

2   what the situation was in 1995, 1996, 1997 and

3   things got steadily worse over each point in time.

4         Then I had discussions with Mr. Young and

5   pointed out that these are the things that if you

6   are faced with an auditor with this information,

7   what would be your options.

8      Q    What information are you talking about?

9      A    The life expectancy estimates.  I mean,

10  going to my report -- on Page 5 of my report by 1996

11  if you look at all of the policies that hit their

12  life expectancy dates, roughly 72 percent failed to

13  mature by that date.

14        But at that point there were only 27.9

15  percent that hit that date.  So the jury is still

16  out on over 70 percent of them.

17        By 1997, however, now we have a known

18  resolution on 48.2 percent and of that amount 85

19  percent were beyond life expectancy and by 1998 it

20  was up to 90 percent and 75 percent of the policies

21  were resolved.

22        So the situation was getting steadily

23  worse and that would have -- even if it was missed

24  in the beginning, it became more -- increasingly

25  more apparent.

1    Q    So what you told Mr. Young, you basically

2    asked him if this information became known to the

3    auditors, say in 1997, when they were expressing

4    their opinion for the 1994, 1995, 1996 financials,

5    what would you have done, and in essence what Mr.

6    Young told you is if all of this was made available

7    to me or I knew about this in 1997, I would have

8    walked away if I was auditor and could not have

9    expressed an opinion, correct?

10    A    No, not necessarily.  What he said was

11    that he would have performed additional procedures,

12    hired a specialist, taken additional steps and I am

13    going to let Mr. Young talk about that, but ---

14    Q    If it was verified, I guess.

15    A    Well, I guess what I am saying is that

16    there was an indication, Mr. Young believes, that

17    there should have been a specialist used all along

18    to be able to -- since this life estimate was such a

19    critical piece of the entire business and that some

20    specialist should have been brought in in order to

21    assess the reasonableness of these life

22    expectancies.

23         But certainly this created a greater sense

24    of urgency.  This created more of an issue than if

25    all of the policies happened to be maturing when

Martinez vs. Spear                                June 4, 2007

1    they should have matured then perhaps it would not
2    have been as great of an issue.
3           But in light of what was happening and
4    going on with the company, more should have been
5    done.  And ultimately, there would have -- it's not
6    a simple decision to walk away.  I mean, it is
7    clearly a very complicated decision, but ultimately
8    I think that is the end result.
9        Q    And had these procedures been done --
10   based on what he told you, had these procedures been
11   done to determine the degree of people outliving
12   their life expectancy, at what point, at what year
13   did he indicate that it would have required Spear
14   Safer to walk away?
15       A    He didn't give me a specific date.
16       Q    Do I understand that you have taken two
17   dates in your report, 1997, and you've even taken a
18   later date, 1999, by saying that even if it wasn't
19   available by procedures to know in 1997, surely by
20   1999 procedures, I am assuming, could have been done
21   and had they been done it would have required them
22   to basically, you know, not give an unqualified
23   audit at that time, right?
24       A    Yeah.  What I'm saying is by '99 virtually
25   every one of the MBC policies had hit their life

1    expectancy date, 98.5 percent.

2         Q    So determining those two parameters that

3    is why you determined the alleged investor damages

4    for monies paid by investors after 1997 and you also

5    did a calculation as to the amounts that were paid

6    in by investors after 1999, which is ---

7         A    Well, I did it for a regulatory lag.  What

8    I assumed was that by 1997 there should have been a

9    response that would have resulted in the follow-up

10   that would have led to the decision not to issue an

11   audit opinion.

12        And 1999 there was nothing left to see.  I

13   mean, all of the policies at that point had reached

14   their resolution date, the day in which they should

15   have hit their life expectancy.

16        So based on those parameters I've

17   calculated damages based on some response subsequent

18   to those two period dates, audit dates.

19        Q    The procedures that Mr. Young told you

20   that should have been allegedly done, let's take

21   1997 when it was -- when you say that it should have

22   been known that many, many people were exceeding

23   their life expectancies, did he indicate to you that

24   those procedures would have basically led in 1997

25   Spear Safer to believe there was fraud going on or

1   simply to come to an understanding that hey, a lot

2   of these people are outliving their life

3   expectancies for whatever reason, be it AIDS,

4   advancement in medicine, AIDS medication, et cetera?

5        A    I haven't had that conversation with

6   Mr. Young.

7        Q    You understood what the question was?

8             In other words, we can determine in 1997

9   and say 100 percent of the people are outliving

10  their life expectancies and that may create in your

11  opinion some sort of concern, but that might be

12  different than determining in 1997 that the reason

13  people -- the reason that people are outliving these

14  life expectancies had been determined is because of

15  fraud.

16       A    There are other issues involved that went

17  into Mr. Young's opinions and I think you need to

18  ask him about what those issues were.  It wasn't

19  strictly an issue of investors living beyond their

20  life expectancies.

21       Q    Did he ever tell you, Mr. Bouchner, when

22  in his opinion he believes the fraud should have

23  been determined by Spear Safer?

24       A    Mr. Young believes that there were

25  problems with the audit from the very onset.  But he

1    didn't specifically tell me exactly what date Spear

2    Safer should have walked away.

3         Q    When I say, "date," I mean year.  Did he

4    tell you what year that he believed they should have

5    determined that fraud was taking place?

6         A    He knew the analysis that I had done which

7    was included in my report and he was comfortable

8    with that.  But that was my opinion, not his.

9              My opinion identified what was happening

10   at the relevant dates.  He analyzed the problems

11   with the audits throughout the audit relationship

12   and collectively those two pieces put together allow

13   to determine a time in which the -- it would not

14   have been possible to issue a clean opinion.

15        Q    And did he also assume that Spear Safer or

16   did he also tell you to assume that if Spear Safer

17   could not issue a clean opinion, that no other CPA

18   firm could also audit MBC financial statements and

19   also could not issue a clean opinion?

20        A    We didn't have that conversation.

21        Q    What was your understanding of Mr. Young's

22   opinion with regard to the alleged GAAS deviations

23   on the part of Spear Safer?

24        A    Really -- I mean, I read his report, but I

25   don't have ---

Martinez vs. Spear                                        June 4, 2007

1        Q    Can you summarize them for me?

2        A    I know that he specifically addressed the

3   use of a specialist, independence and independence

4   issues and -- sorry, I'm drawing a blank.  But it's

5   really his opinion, not mine.

6        Q    Other than confirming the fact that -- I

7   think you referred to ---

8        A    Managing and supervision.

9        Q    Did he tell you or did you assume what

10  those alleged failures -- let's just take those

11  areas.  I'm not saying they are inclusive, but lets

12  take those areas.  Did he then tell you what the

13  alleged failure on the part of Spear Safer in those

14  three GAAS areas, how that damaged MBC or was that

15  then your responsibility to determine that?

16       A    He looked on his own through workpaper

17  files and reached whatever conclusions he reached

18  with regard to the standard of care issues.

19            I then took his report and looked to when

20  the issue would have come to light and I think that

21  is where there is some nexus between what I have

22  done and what he has done.

23            He is not testifying to a specific date,

24  but he looked at the work that I had done and agreed

25  that that would have been a point in time at which

Martinez vs. Spear

1    the writing was on the wall.

2         Q    Who did the report first, you or him?

3         A    His report was done -- the appendix to his

4    report was written in largely the way it was and the

5    way you received it like I said prior to the

6    complaint being prepared.

7         Q    So you prepared your damage report since

8    then, right?

9         A    Yes.

10        Q    I think you might have mentioned -- did

11   you mention an acurarial study is one of the things

12   that Mr. Young said that should have been maybe

13   considered as part of testing on the part of Spear

14   Safer?

15        A    No.

16        Q    Did Mr. Young tell you that that was one

17   of the procedures that he believed -- and again, I

18   am only asking you this because there could be

19   something that he might have told you other than

20   what is in the report.

21        A    I understand.

22        Q    I'm asking you did he indicate to you that

23   an acurarial study would be one the procedures that

24   Spear Safer should have utilized in order to try to

25   determine what the real life expectancies of the

Martinez vs. Spear                        June 4, 2007

```
1    viators was?
2         A    I don't recall any specific conversation
3    that he believed they should have gotten an actuary.
4    He didn't say that they shouldn't.  But he did point
5    out to me that Spear Safer workpapers did suggest or
6    urge management to consider the use of an actuary
7    which didn't happen.
8              I don't recall what Mr. Young's specific
9    thoughts were as to whether that should or should
10   not have been done.
11        Q    Would you know other than the fact that
12   viators were living beyond their life expectancies
13   what else an acurarial study would reveal?
14        A    Like I said, I had no conversations with
15   him so I have no thoughts on that.
16        Q    As of December 31st of 1994 did you
17   determine how long on average viators were living
18   beyond their original life expectancies?
19        A    Many of them are alive today.  So at this
20   point, all I determined was that when the life
21   expectancy date was reached, I looked to how many --
22   actually how many policies had matured by those
23   dates.
24        Q    How would the viators living beyond their
25   original life expectancies have affected Spear
```

1   Safer's audits and their ability to issue any type
2   of an opinion?
3       A    Well, when you have a situation where in
4   excess of 90 percent of the policies had not matured
5   by their life expectancy, that should have trigged
6   some investigation into whether these lives were
7   being estimated correctly at all.
8            And if it was determined that there were
9   reasons other than just the estimates were done with
10  all appropriate due diligence and integrity, that
11  would have created an issue.
12      Q    And that investigation as to what would
13  have been done, is that within the realm of
14  Mr. Young's opinions?
15      A    What should have been done and what steps
16  should have been taken are Mr. Young's opinions.
17      Q    As opposed to yours?
18      A    As opposed to mine.
19      Q    Has he shared with you what he thought the
20  investigation that should have been done -- has he
21  shared with you what he thought the investigation
22  should have been done?
23      A    Well, I know that we have discussed hiring
24  a specialist to evaluate the reasonableness of those
25  life expectancies and why none of the policies were

1    maturing in time.  It was something that he felt

2    should have been done, but beyond that, you would

3    have to ask him.

4        Q    Did he indicate to you that Dr. Mitchell

5    was a specialist?

6        A    He indicated to me that Dr. Mitchell

7    was -- there were issues in the workpapers that

8    identified problems with Dr. Mitchell and the life

9    expectancy estimates that he gave.

10       Q    What did he say in the workpapers do you

11   recall?

12       A    Just that there were indications that

13   there were charges being brought against

14   Dr. Mitchell.

15       Q    But that was in 2001, wasn't it?

16       A    Yes.

17       Q    Did he tell you -- again, maybe he did,

18   maybe he didn't -- well, let me go back to my other

19   question.

20            Apart from 2001, back in 1997, 1998 do you

21   know whether Dr. Mitchell and Dr. Escobar and other

22   doctors who might have been utilized by MBC would be

23   considered specialist according to GAAS?

24       A    I think the issue there was that even if

25   there was some reason to accept their

Martinez vs. Spear                                      June 4, 2007

1    representations when they were made, because none of

2    the policies were maturing when they should have

3    matured, there would have been an obligation to go

4    back to look to see why because it wasn't like the

5    situation was getting better.

6              Every year -- it didn't look like they

7    were becoming better estimaiting.  It was just that

8    the policies were not maturing.  So there was some

9    onus to go back and determine whether there was a

10   reason for that.

11             So I don't know if -- whether there were

12   experts or not at that initial point was as relevant

13   as nobody went back to check their work.

14        Q    Did he tell you how the work had been

15   checked?

16        A    No.

17        Q    Did he tell you what sort of other

18   specialist should have been hired by Spear Safer

19   presumably?

20        A    I haven't had that discussion.

21        Q    Do you know what is a contingent liability

22   as defined by GAAP?

23        A    I have an understanding of what a

24   contingent liability is.

25        Q    How is it defined under GAAP?

Martinez vs. Spear                                        June 4, 2007

```
 1        A    Well, my -- I'll give you my definition.
 2   It's a contingent out of -- it's a liability that
 3   isn't absolute knowing, but it's predicated on
 4   certain other things happening.  Like a litigation.
 5   It could be a contingent liability if you lose a
 6   litigation and you have a liability, but it's not
 7   necessarily absolute at any given point in time.
 8        Q    What would be a contingent premium
 9   liability for instance in this case?  What would be
10   an example of that?
11        A    I think this is outside the area of my
12   expert testimony.
13        Q    Do you know how the contingent premium
14   liability -- and again, if it is outside of the part
15   you're doing, just tell me, because I'm not sure.  I
16   don't have the ability to know that.
17        A    Okay.
18        Q    How was contingent premium liability
19   recorded in MBC's financial statements?
20        A    It's outside of my testimony.
21        Q    Is it your understanding that in order
22   to -- for an auditor, and again, if it's outside,
23   just tell me, and I won't preface that anymore by
24   saying that.
25        A    I understand.
```

1      Q     Is it your understanding that for an

2   auditor not to give an unqualified opinion, that the

3   representations or misrepresentations in a company's

4   financial statements need to be material?

5      A     I don't have a specific understanding

6   other than I would characterize it as a layperson's

7   understanding.  So I don't have any expert opinions

8   in that area.

9      Q     You mean as to what GAAS requires?

10      A     I'm not an auditor and I am not an expert

11   in GAAP or GAAS.

12      Q     Did Mr. Young indicate to you or in his

13   report is it indicated that there was a misstatement

14   under GAAP in MBC's financial statements for any

15   given year?

16      A     As I indicated, the concerns that

17   Mr. Young expressed to me was the ability to issue

18   an opinion when you have management integrity issues

19   and problems as pervasive as what happened in MBC.

20      Q     Did he -- and I don't think you did this,

21   but did he quantify the amount -- did he quantify

22   any misstatement on the MBC financial statements

23   beginning in 1994 to 2002?

24      A     I don't believe he did.

25      Q     Did he indicate in his report or did he

Martinez vs. Spear                                    June 4, 2007

```
 1   tell you that he believed that the
 2   misrepresentations in the MBC financial statements
 3   according to GAAP were material misrepresentations?
 4        A    I believe they were material, but again,
 5   you know, I'm speculating as to things that he might
 6   say.  We haven't had those conversations.  I've read
 7   his report and his report I think speaks for itself,
 8   but we haven't had anything -- any substantive
 9   conversations in that area beyond that.
10        Q    Could you give me an example of a
11   misstatement in the financial statements, let's say
12   in 1996 in an MBC case?  Could you give me an
13   example of one misstatement?
14        A    I'm not testifying to that.
15        Q    And if I asked you each of the years, your
16   answer would be the same, right?
17        A    Yes.
18        Q    Did Mr. Young in his report state for each
19   year what the misstatements were according to GAAP
20   in the MBC financial statements?
21        A    Mr. Young didn't do a year-by-year
22   restatement, because it was his belief that, as I
23   have said several times now, there were pervasive
24   problems with the life expectancies and those
25   problems should have led to additional audit
```

1   procedures that would have discovered the fraud that

2   was being perpetrated and as a result, it would have

3   been impossible to issue an opinion.

4          And I may be mischaracterizing his

5   testimony in some way and you should confirm that

6   with him.

7     Q   So he didn't give any specific amount of

8   money on any given years financial statement that

9   basically misrepresented MBC's financial condition,

10  right?

11    A   This was not an issue of adjusting the

12  reserves.  This was an issue of whether any of the

13  revenues that were coming in could be relied on.

14    Q   And he essentially told you that when that

15  determination allegedly should have been made by

16  Spear Safer, that's when they should have basically

17  walked away, right?

18    A   Upon performing the appropriate procedures

19  when it became known or knowable to him that -- let

20  me -- strike that.

21         When it became known that the problems

22  were a result of management integrity issues and/or

23  fraud as opposed to misestimates, that would have

24  been the time to walk away because you can't issue

25  an audit opinion when you can't rely on the

```
1    integrity of management and management
2    representations.
3         Q    Let's talk about the State of Florida.  At
4    the time Spear Safer got involved, do you know
5    whether the State of Florida had any questions
6    regarding the integrity of MBC management?
7         A    I don't know specifically if they knew or
8    did not know.
9         Q    How about the SEC?  They had questions
10   regarding the MBC integrity of their principals as
11   of the time Spear Safer got involved, didn't they?
12        A    In 1995?
13        Q    1997 when they issued this audit statement
14   didn't the SEC have questions about the integrity at
15   that time of MBC management?
16        A    They may have had questions.
17        Q    Have you ever been asked to express an
18   opinion regarding whether a company's financial
19   statements were prepared in accordance with GAAP?
20        A    No, I have not.
21        Q    Mr. Bouchner, I am on Page 2 of your
22   report and you might want to take a look at it.  I
23   will ask you some questions about it.
24             In Roman III, A and B, you expressed the
25   monetary damages that you alleged were caused by
```

Martinez vs. Spear                                June 4, 2007

1    Spear Safer.   Under A and B there are two theories.
2            One is the investor amounts paid and the
3    other is the amounts paid to related parties.   Is
4    that right?
5        A    That's right.
6        Q    And then the fact that you have given two
7    numbers on each really has to do with what we
8    discussed before, and that is whether you want to
9    take 1997 or 1999 allowing for two years of
10   regulatory action as to when Spear Safer allegedly
11   should have taken the action that you claim they
12   should have, right?
13       A    That's right.
14       Q    Now, I want to look at your last
15   paragraph.   It says, "In calculating damages under
16   these two alternatives, I have assumed that Spear
17   Safer committed professional malpractice in
18   performing its audits of MBC pursuant to the expert
19   opinions reached by John Young, CPA in his expert
20   report."
21            And I think we've already gone over that.
22   You've said -- you've also amphilified what he even
23   told you.   And then you went on to say, "Had it not
24   committed professional malpractice, SSH would have
25   been unable to issue unqualified audit opinions that

Martinez vs. Spear                                        June 4, 2007

1    were used by MBC in its regulatory filings."

2              Now, you started that whole sentence off

3    by, "I have assumed."  Did you assume that if SSH

4    was unable to issue unqualified opinions that they

5    would have been unable to issue unqualified

6    opinions?  Did you make that assumption?

7         A    Based on my conversations with Mr. Young.

8         Q    But Mr. Young told you that, then?  That

9    is not your assumption?  It's an assumption based on

10   something Young told you?

11        A    Right, right.

12             Excuse me one second.  Let me just -- if

13   you don't mind, I want to look at something else in

14   the report.

15        Q    No problem.

16        A    The answer is it was something that I

17   assumed based on my conversations with Mr. Young and

18   it could have been more clearly expressed, but those

19   were never my independnet assumptions.

20        Q    That is what I was trying to get at.

21   Since you're not an auditor, you couldn't make that

22   assumption unless somebody who could do audits told

23   you that.

24        A    That's correct.

25        Q    You also stated, Mr. Bouchner, you went on

Martinez vs. Spear                                    June 4, 2007

1  to say that, "I have been asked by counsel to assume
2  that plaintiff will be able to prove at trial that
3  without these unqualified audit opinions, MBC would
4  have either been unable to continue to operate or
5  its operations would have been significantly
6  curtailed."
7           Have you been told what witnesses will
8  prove or show at trial that MBC could not operate
9  without these opinions or that their operations
10  would have been significantly curtailed?
11      A    I was told by counsel that there will be
12  witnesses called who may address that issue and
13  those would be witnesses that we discussed prior to
14  breaking for lunch.
15      Q    Were you told that any of these witnesses
16  would be regulatory officials of any of the various
17  states where MBC was licensed with regard to that?
18      A    I don't know who is going to be put on the
19  stand.  I was just told that this was not something
20  that I would be asked to opine on, but it will be
21  something that the receiver would be proving at
22  trial.
23      Q    And what specifically is the basis of your
24  assumption that Spear Safer would have been unable
25  to issue unqualified audit opinions for 1994 through

1    2003?   That assumption that you told me.
2            MR. MINER:   Objection.   I think it
3        mischaracterizes his testimony.   Are you
4        referring to a specific spot in the report?
5        Q     Yeah, on Page 3 of your report, and my
6    question is what's the basis of your assumption on
7    Page 3 that Spear Safer could not have issued
8    unqualified audit opinions on MBC's financial
9    statements?
10           MR. MINER:   Where on Page 3?
11       Q     Page 3.
12       A     I don't see specifically where you are
13   referring to there.
14       Q     It is under 5 A, B.   It is in the second
15   to the last paragraph.   "I have also assumed" ---
16       A     I don't believe that the dates that I
17   testified to were in 1994 through 2003.   I believe
18   that my assumption was that at some point between
19   1997 and 1999 it would have been more apparent that
20   there were problems that perhaps would have gone
21   undetected in the prior years and at some point
22   between '97 and '99 Spear Safer should have come to
23   the realization had they performed the appropriate
24   procedures that Mr. Young will testify to that it
25   would have come to light and they would have been

1    forced to walk away.

2        Q    So you already explained to me based on

3    the Young report and what Mr. Young told you as to

4    the basis for your assumption that they could not

5    have given an unqualified opinion?

6        A    That's right.

7        Q    Other than Young and his report are you

8    relying on anyone else or anything else to support

9    your assumption that they would not have been able

10   to issue unqualified opinions from '97 through 2003

11   other than Young and Young's report.

12       A    Well, Mr. Young provides the portion of

13   that assumption that deals with the liability issue.

14   I believe that the work that I had documented on

15   Page 5 of my report is part of that.

16            So in reaching that assumption it did

17   include some of the work that I did, which looked at

18   what information would have been available at the

19   time of these audits.

20            So it would be part of, and you know, what

21   appears on Page 5 of my report is not something that

22   Mr. Young is testifying to.

23       Q    That is the analysis of the life

24   expectancies and the matured policies, the resolved

25   policies and things like that?

Martinez vs. Spear                                    June 4, 2007

```
 1        A     That's right.
 2        Q     Can you describe any circumstances on
 3   which it would be appropriate for an auditor to
 4   include explanatory language?
 5             MR. MINER:  Objection.  Are you talking in
 6        general or ---
 7        Q     In general.
 8        A     No, I can't.
 9        Q     Do you know what agreed upon procedures
10   are in connection with services provided by an
11   independent auditor?
12        A     Yes.
13        Q     What are they?
14        A     They are a series of procedures that the
15   auditor will reach an agreement with the client
16   where the client takes responsibility for the
17   procedures performed and the auditor essentially
18   takes responsibility that those procedures were
19   performed correctly, but ultimately the auditor is
20   performing procedures at the request of the client.
21        Q     Who performed the agreed upon procedures
22   for MBC and the Spear Safer audit, do you know?
23        A     I don't understand.  There was one agreed
24   upon procedures engagement that I saw in the Spear
25   Safer workpapers involving a North Carolina matter.
```

1    But there were no specific agreed upon procedures
2    that I'm aware of in terms of their annual audits.
3         Q    Do you know what role the firm of DeMayo &
4    Young played in the agreed upon procedures?
5         A    I believe they may have had some role in
6    looking at the trust account of Brinkley, McNerey,
7    perhaps, but I don't recall.  I really only skimmed
8    through the audited workpapers so I have a limited
9    understanding.
10        Q    Would you be in a position then to give an
11   opinion as to whether or not Spear Safer had a right
12   to rely on any of the work performed by DeMayo &
13   Young in connection with this audit?
14        A    I only know they had some involvement.  I
15   don't know what it was.
16        Q    Can financial statements with a qualified
17   auditor's opinion be given to regulatory agencies
18   for a business like MBC?
19        A    I don't know.
20        Q    But again, just to be clear, in this case
21   what Mr. Young has told you is that it is not a
22   matter of whether in his opinion Spear Safer should
23   have issued any of the various categories of
24   qualified opinions, but instead should have just
25   withdrawn from the engagement.  That is what he told

Martinez vs. Spear                                    June 4, 2007

1    you, right?

2        A    Right, yes.

3        Q    And then you assumed that if Spear Safer

4    walked away from the engagement, they would

5    either -- and I think you put this in there, either

6    basically be put out of business or their business

7    operations would be significantly curtailed,

8    correct?

9        A    That's right.

10       Q    Did anyone tell you that if Spear Safer

11   walked away and MBC did not provide an audited

12   opinion, that their business operations would be

13   shut down?

14           MR. MINER:  Objection.  I think you said

15       MBC audited opinion.

16       Q    I'm sorry, Spear Safer's audited opinion.

17       A    I was told specifically to assume what I

18   have reflected in my report, which is that they

19   would have either been unable to operate or their

20   business operations would have be severely curtailed

21   because their business had grown dramatically over

22   the course of the nine or ten years of its

23   existence.

24       Q    Did you do a damage estimate,

25   Mr. Bouchner, based upon the second part about

1  possibility, that is damages that would have
2  allegedly been incurred if their businesses were
3  curtailed as opposed to shut down?
4      A    I have not done an analysis of that
5  measured amount of the curtailment.
6      Q    That would be less than the amounts that
7  you put in the report, wouldn't it?
8      A    Perhaps.
9      Q    Well, your report talks about investments
10  made after the alleged audit failures of Spears
11  Safer, which if it had not occurred, it would have
12  led to a -- basically a cessation of business,
13  right?
14      A    Mutual Benefits became one of the largest
15  providers of viatical policies in this country and
16  it was the scheme that they were involved in that
17  allowed them to grow to the level that they did.
18          My assumption is that had this been
19  uncovered early on, had they not had audited
20  financial statements provided to the regulatory
21  bodies that required them, had they disclosed the
22  fact that they were unable to obtain licenses for
23  those states that required them, there would have
24  been ramifications to the business which would
25  either prevent it from continuing to operate or at

1   least changed it in such a dramatic fashion that

2   they would have essentially not been able to

3   generate the type of revenue and investments that

4   they did.

5        Q     But would investors under the second prong

6   of that still be paying monies towards these life

7   insurance policies?

8        A     Not necessarily.

9        Q     So are you looking at that then as one in

10  the same, that is that there would be no investor

11  monies that would be lost in those same amounts

12  required regardless of whether the business was

13  curtailed or if they were ceased doing business?

14       A     What I'm saying is that MBC took in nearly

15  a billion dollars of investor dollars subsequent to

16  1997 and that amount may have declined to some

17  extent.  I mean, that amount would have declined

18  probably dramatically if they were unable to obtain

19  audit opinions.  That is the assumption.

20           Now, I'm not saying that every last dollar

21  would have been eliminated, but generally they would

22  have been a very different company than what they

23  became.

24       Q     As of 1997, which is the first year --

25  well, actually, as of 1999, which is the accounting

1   for two years of regulatory action, then 2001 if you
2   then use the alleged negligence beginning in 2005 so
3   I will take 1999.
4           As of 1999 do you know how many states at
5   that time did MBC sell policies in?
6       A   I believe that they were actively selling
7   policies in many states, but I don't know the
8   specific number.
9       Q   How many of those states actually required
10  licenses?
11      A   Not all of them, but I don't know the
12  answer to that either.
13      Q   How many of them required or were you
14  given to understand actually required them to have
15  audited financial statements?
16      A   I don't have a specific number.  I do know
17  that it was not a majority of the states that they
18  were operating in.
19      Q   Well, don't you need to know that to make
20  an assumption that the business would be closed down
21  to -- that it would be necessary to find out which
22  states required the opinion to begin with?
23      A   I'm not opining on what would have
24  happened.  I am assuming that it would have been the
25  result based on facts that had been proven at trial

Martinez vs. Spear                          June 4, 2007

1   by counsel.

2        Q    Well, let me ask you if you know the

3   answer to this:  If a company was not required

4   pursuant to its doing business in a particular state

5   to present an audited opinion, do you have any

6   information at this point to indicate that that

7   company's operations would cease?

8             MR. MINER:  Objection.  Confusing, vague

9        hypothetical.

10       Q    If Spear Safer, say, in 1997 did not walk

11  away, and my question basically is, do you know what

12  impact -- do you have any facts to indicate what the

13  impact of that would be in states where audited

14  financial statements were not even required?

15       A    I don't know -- well, I will tell you what

16  I do know.  The audit workpapers indicated that the

17  purpose of the audits were for regulatory purposes,

18  for regulatory filings, which was confirmed by

19  Mr. Schroeder in his deposition.

20       Q    That he was told by Brinkely, McNerey,

21  right?

22       A    That they would be used for that purpose.

23       Q    Right.

24       A    And that the audited financial statements

25  were -- I have copies of licenses and I have copies

Martinez vs. Spear                                    June 4, 2007

1    of the applications that contain audited financial

2    statements for certain periods of time.

3              I didn't have access to records that

4    predated the more recent years, but I have been

5    asked to assume that based on the information --

6    based on any of these regulatory requirements and

7    the fact that the applications that I looked at all

8    requested you to disclose where you would be turned

9    down for licensing or for applications.

10             If there would have been some type of --

11   id there would have been a ripple effect that they

12   would not have -- the reason they were able to grow

13   is because they were able to continue to operate

14   without any restraint.

15        Q    So you're saying that even in states that

16   didn't require an audited opinion but in the reports

17   that MBC had to file they were told or they were --

18   they had to put whether or not their license was

19   declined or denied or not reviewed in any other

20   states?

21        A    I don't have the specifics of each state

22   and what requirements there were or whether there

23   were licensing requirements, or if there were

24   licensing requirements if there were other reporting

25   requirements.  It's not something that I am going to

1   offer any opinions on.  It is something that will be
2   proven at trial.
3        Q    Well, you're assuming that when you come
4   up with this figure, like in your first scenario of
5   let's say 136 million dollars in the first scenario
6   that the alleged malpractice occurred in 1997,
7   you're assuming that at that time MBC's operations
8   in all of the states would have either been -- at
9   the same time would have either been curtailed or
10  shut down I think within two years, right?
11       A    I'm assuming essentially that this company
12  wouldn't have grown to be what it became, a company
13  with total investments approaching a billion dollars
14  or in excess of a billion dollars.
15       Q    But you're assuming as of, let's say, 1999
16  with the first scenario that their business
17  operations would have been shut down or curtailed in
18  every state that they did business because of the
19  lack of having an unqualified statement, right?
20       A    What I am assuming is that this business
21  operations in general would not have grown the way
22  it did and they would not have been -- they would
23  have been a fraction or -- they would either have
24  ceased to continue to operate or they would have not
25  been able to grow the way they did.

Martinez vs. Spear                                                    June 4, 2007

1       Q     And that assumes that the regulatory

2   agencies in each state would have not allowed them,

3   let's take the first state, as of 1999 to do

4   business any longer in their state, and therefore as

5   you said, any money put in by an investor after that

6   time basically never should have been put in because

7   they would have been shut down in every single state

8   in the country.

9       A     Not necessarily.  There could be

10  situations where a regulator would have gone in and

11  this could have triggered other types of regulatory

12  actions.

13          I'm not contemplating all of the possible

14  ramifications of what could have happened, but the

15  underlying assumption is that this would have led to

16  a response that would have ultimately prevented the

17  company from operating in the way that it did.

18      Q     So that these investors in the first

19  example wouldn't have put in 136.4 million dollars

20  after the alleged regulatory response in all of the

21  states?

22      A     What I am assuming is that the company

23  would not have been able to continue to operate.

24  There would have been a regulatory response at some

25  level that prevented the company from growing in the

1    way that it did.

2          It was growing at levels that were well in

3    excess of any other company in the industry and it

4    was able to do so as a result of this fraud and this

5    fraud happened because the regulatory bodies were

6    not -- had not done anything to do -- earlier on

7    similar to what happened in 2004.

8          So yes, it is an assumption that there

9    would have been a response that would have prevented

10   them from growing.  I'm not testifying that there

11   would not have been any -- they may have been shut

12   down altogether.  I don't know.  That's not what I'm

13   opining to.

14         What I'm opining to is that if they were

15   curtailed from operating, prevented from growing

16   because of some regulatory response, this is what

17   the ramifications would have been.

18   Q    But you've taken just the total -- you've

19   simply done that by taking a total, like say 1999,

20   and then taken every investor dollar that went in

21   after 1999 and basically say that's damages, right?

22   A    No.  Once I determined the total of

23   investor dollars that came in at various year ends,

24   I then reduced it for an estimated recovery rate,

25   which netted out to what the damages would be.

1    Q    I left that part out, I apologize.  You
2    did consider it.  But the bottom line is you used
3    the basis that -- in using 1999 again, every
4    investor dollar that came in after 1999 you're
5    basically saying in your model that that -- if Spear
6    Safer had walked away that that money never would
7    have come into the company, right?
8    A    Yeah, basically.
9    Q    Florida didn't require an audited
10   financial statements, did they?
11   A    Not until a certain point in time.
12   Q    Until what year?
13   A    I don't know.
14   Q    Certainly not when Spear Safer was
15   involved.
16   A    It may have been 2003.  Well, there are
17   other issues in addition to the audited financial
18   statements.
19        My understanding is that Spear Safer was
20   involved in the very beginning and helped MBC create
21   its method of accounting.
22        My understanding was that from the very
23   beginning the company didn't have the accounting
24   expertise to be able to set this up appropriately.
25   So it was more than just -- this role is more than

Martinez vs. Spear                                      June 4, 2007

1    just providing audited opinions, but also helping

2    the company established the way that this all needed

3    to be done and recognized.

4          So their role, I think, was greater than

5    that, but again that is something that I think falls

6    more under Mr. Young's area of testimony than to

7    mine.  He will be discussing exactly what their role

8    is and what their liability issues are.

9     Q     Would you agree that if your assumption is

10   wrong, that is, that there would not be any

11   regulatory action taken that you have assumed that

12   your damages are either going to be reduced or

13   possibly eliminated, depending on whether or not

14   your assumption is right?

15    A     I would agree that if there were no

16   regulatory actions regardless of what opinions were

17   given that my damage calculation would not be

18   accurate.

19          MR. MINER:  Pete, I don't mean to

20       interrupt you, it is about 3:15.  When we reach

21       a convenient point, can we take a short break?

22          MR. MURPHY:  Sure.

23    Q     I'm going back to my other question that

24   I'm not quite sure that you answered.

25          Some time, and I believe it was actually

1    in 2006, the State of Florida did require audited

2    financial statements for viatical providers if -- by

3    the way, the State of Florida was by far the largest

4    state in which MBC bought and sold life insurance

5    policies, wasn't it?

6         A    I don't think I looked it up by state.

7         Q    Well, what percentage -- you indicated

8    total investor dollars, for instance, in your first

9    model, the 136.4.  What percentage of that would be

10   based on policies sold to investors in Florida, do

11   you know?

12        A    I haven't done that calculation.

13        Q    But wouldn't that be important to know

14   especially if you consider that Florida, during the

15   time Spear Safer was involved in the engagement,

16   didn't require audited opinions?

17        A    Not necessarily, because my assumption was

18   that there would have been a regulatory response or

19   ultimately would have resulted in the prevention of

20   the company from operating as it did.

21             Now, that didn't necessarily have to be in

22   the form of an audited financial being delivered to

23   the State of Florida.  It could have been a result

24   of other regulatory actions.

25        Q    Like what?

1       A     That is something that is going to be

2    addressed by the receiver.  It's not part of my

3    opinion.

4       Q     Well, the State of Florida is

5    investigating them and determined fraud that

6    occurred in selling these things in 1999.

7             Do you know why regulatory action wasn't

8    taken by the State of Florida in 1999 to take away

9    their license in view of -- since we are discussing

10   regulatory actions?

11      A     No.

12            MR. MINER:  Can we take that break now?

13            MR. MURPHY:  Let me just finish this page,

14      Curt, then we will take a break.

15            Let's take a break.

16            (Recess taken.)

17      Q     Mr. Bouchner, would you agree that your

18   opinions and the work that you have conducted in

19   regard to providing your opinion would be governed

20   by the Code of Professional Conduct of AICPA?

21      A     I'm not a certified public accountant, but

22   I try to adhere to all of the standards of AICPA.

23      Q     So you would agree obviously that in your

24   opinion you attempted the best you could to comply

25   with the standards set forth in the particular parts

Martinez vs. Spear                    June 4, 2007

```
 1    of that code that would apply here?
 2         A    Yes.
 3         Q    In the report of Mr. Young and your review
 4    of it did he state anywhere that had Spear Safer
 5    conducted their audit in accordance -- allegedly in
 6    accordance with GAAS that this fraud that was being
 7    perpetrated by MBC would have been uncovered either
 8    for any of the years we are using, even 1997 and
 9    1999?
10         Let me see if I can make it more
11    understandable for you.  As opposed to saying there
12    were material -- he was talking about material
13    misstatements, wasn't he?
14         A    I don't believe his report explicitly
15    states that there would have been fraud that was
16    uncovered.
17         Q    But did his report say that had Spear
18    Safer conducted their audit in -- allegedly in
19    compliance with GAAS that as of a certain date this
20    massive fraud that was being perpetrated in this
21    product by MBC would have been uncovered?
22         A    I believe this is consistent with what I
23    had discussed earlier in that Mr. Young's belief is
24    that had there been sufficient procedures performed,
25    it would have been -- fraud would have been
```

1   detected.  I don't believe it specifically says that

2   in the report, but that would be inherent with the

3   same idea that Spear Safer would not have been able

4   to issue an audited opinion for that reason.

5        Q    But that's different, wouldn't you agree,

6   that is the results of the alleged deviation from

7   the standards of GAAS?  It's one thing that those

8   deviations would result in a discovery of fraud

9   versus those action or alleged actions would result

10  in a misrepresentation of the company's financial

11  statements.  There are two different things.

12       A    Well, let me be careful because I don't

13  want to put any words in Mr. Young's mouth.

14            First of all, fraud is a legal conclusion.

15  It's not something that he would be able to opine

16  on.

17            What I believe Mr. Young would testify to

18  is that had sufficient procedures been performed by

19  Spear Safer they would have been unable to sign an

20  audited opinion.

21            As far as whether they would have

22  determined whether that is fraud, that is really up

23  to the Court or a trier of fact to decide that.

24       Q    And that's what I am saying.  I know he

25  told you that that would have been the result.  But

1   I'm just trying to ascertain, because I didn't see

2   it in the report, did he actually tell you that the

3   reason they couldn't in his opinion have issued or

4   should have walked away is because at that point in

5   1997 and 1999 they should have actually discovered

6   the fraud that was being perpetrated?

7        A    What he told me was that had the audit

8   been conducted in accordance with GAAS, management

9   integrity issues would have arisen that would have

10  prevented the company -- prevented Spear Safer from

11  signing an audited opinion.

12       Q    And management integrity issues such as

13  what?

14       A    You will have to ask Mr. Young.

15       Q    And sometimes I am just asking you these

16  things so I know who is going to be addressing those

17  things.

18       A    Yeah, he's going to be addressing all of

19  those issues.  As a sneak preview, I am telling you

20  some things that he has told me.  But really that is

21  the essence of it.  He's testifying to the liability

22  issues and I have incorporated some of those

23  assumptions as part of my analysis.

24       Q    You said that Mr. Young in his report and

25  also told you that in view of what Spear Safer

1   really should have seen, additional testing should

2   have been done and had they done additional testing

3   they would have seen that these people -- the

4   persons were regularly outliving their life

5   expectancies?

6        A    Some additional procedures.  I will let

7   Mr. Young talk about what those procedures should

8   have been.

9        Q    Got you.

10            With regard to the non-MBC owned policies,

11  if you know, maybe you do not, why would there be

12  any requirement to test the life expectancies on

13  non-MBC owned policies when MBC did not have the

14  obligation to pay the premiums on those policies?

15       A    You know, again, I am very hesitant

16  because I don't want to be stepping into the shoes

17  of Mr. Young's, but my understanding is that there

18  were certain disclosures that referenced the

19  management insufficiency of the reserves in the

20  Livoti Fund for the payment of the non-MBC policies.

21            Certainly that would be an area that would

22  open the door, but the other area would be the mere

23  fact that if there were problems with the MBC owned

24  policies that led to a potential issue involving

25  integrity of management and perhaps the discovery if

Martinez vs. Spear                                      June 4, 2007

1    there was some type of a scheme being perpetrated,
2    it wouldn't be limited to strictly the MBC policies.
3    The auditor would need to be comfortable with the
4    whole operation which would have opened the door
5    there.
6         Q    So what you're saying is even if MBC did
7    not have an obligation to pay the premiums on the
8    non-owned MBC policies, that had the testing been
9    done -- correct me if I am wrong, had the testing
10   been done as Mr. Young -- on the MBC and on non-MBC
11   owned policies, that this would give Spear Safer a
12   greater general idea of the whole operation of the
13   business, which would have led to some of these
14   conclusions that they should have made?
15        MR. MINER:  Objection.  I think it is
16        confusing what you're asking Mr. Bouchner.  Is
17        this something he had a conversation with
18        Mr. Young about?
19        MR. MURPHY:  Either.
20        MR. MINER:  Is this his understanding of
21        Mr. Young's opinion?
22        MR. MURPHY:  Either.
23        A    I understand that Mr. Young believes that
24   there were problems with the audit and if the audit
25   was conducted correctly, there would have been --

1   things would have come to their attention that would

2   have created a concern and inability to issue an

3   unqualified audited opinion.  In fact, any opinion

4   at all.

5            Beyond that I really can't answer

6   specifically what procedures would have been

7   performed or what should have been looked at.  I did

8   have conversations that it wouldn't be limited to

9   only non-MBC policies, but all of the specifics that

10  go behind that generalization need to be discussed

11  with Mr. Young.

12       Q    In any of the documents that you reviewed

13  to arrive at your opinion did you see any

14  documentation that Spear Safer would have reviewed

15  in connection with their audited opinions that would

16  lead them to believe that the transactions between

17  MBC and the purchasers, and the investors were

18  really anything but arm's length transactions?

19            MR. MINER:  Objection to the form of that

20       question.

21       A    I don't think the issue is whether the

22  transactions are arm's length, but whether there

23  were misrepresentations to investors that resulted

24  in an investment, but I don't have any specific

25  knowledge of non-arm's length transactions between

1    MBC and investors.

2         Q    Before we break I just wanted to clear

3    this up.  We discussed the fact that it appears that

4    it was not until 2006 that the State of Florida

5    Division of Financial Services, Office of Insurance

6    Regulations, required audited financial opinions to

7    be submitted for viatical companies.

8              I then asked you if that was the case, as

9    of '97, 1999 what is the regulatory action that you

10   believe or know would have been supposedly taken by

11   the State of Florida to either curtail MBC's

12   operations or to shut down their operations?

13             MR. MINER:  Objection to the form of that

14        question.

15        A    My engagement that relates to this case

16   was to quantify the damages under the assumption

17   that there would have been a discontinuation or

18   significant curtailment in their operations and

19   that's what I have done.

20             I have not rendered any opinion -- I am

21   not preparing to testify in any way as to what the

22   regulatory actions would have been and that will be

23   pointed out by the receiver at trial.

24        Q    But you haven't been told what the

25   specific facts -- what the specific fact that will

Martinez vs. Spear                               June 4, 2007

1    be brought out at trial that will prove that, I

2    suppose, right?

3        A    Other than that there was a general

4    understanding that these financial statements were

5    prepared specifically for purposes of regulatory

6    filings ---

7        Q    In some states.

8        A    In some states.  And that this was known

9    by all parties involved.  That's really the extent

10   of my knowledge.  What the regulatory's impact would

11   be and what the ripple effect would be if there was

12   anything is outside the scope of my testimony.

13       Q    Would you agree that if Spear Safer could

14   have -- in view of what you say that they should

15   have uncovered, if they could have issued an opinion

16   other than an unqualified opinion, that would have

17   allowed MBC to remain in business that that would

18   also alter or change your damage estimates?

19           MR. MINER:  Objection to the form.

20       Q    That is -- and just again, to make it

21   clear, that is as opposed to walking away if they

22   could have issued a type of qualified opinion that

23   would have still have allowed MBC to continue in

24   business, that that would necessarily affect your

25   damages estimate?

1      A      Hypothetically if MBC or Spear Safer was

2  to issue an opinion that qualified the opinion by

3  stating that management was systematically altering

4  or providing investors with fraudulent life

5  expectancies, and that all sales were based on those

6  fraudulent life expectancies and they made that

7  qualified opinion, would it have allowed them to

8  continue to operate?  I don't know.

9      Q      Is that a -- I'm glad you asked that.  Is

10  that an example of a qualified opinion?

11      A      I'm not testifying to what a qualified

12  opinion is.

13      Q      You just gave it.

14      A      I'm just throwing out that hypothetical.

15          You are asking me to assume if there was a

16  qualified opinion could they have continued to be

17  allowed to operate.

18          What I said is the problem is that

19  these -- this is a company who sold hundreds of

20  millions of dollars of interest in viatical policies

21  based in large part on fraudulent life expectancies.

22  It was determined.

23          Now, if there was some type of a qualified

24  opinion that addressed that issue, I don't know what

25  the ramifications would have been, but that was not

Martinez vs. Spear                                    June 4, 2007

1    something that was ever in my conversations with
2    Mr. Young.  It wouldn't get to that point.  You
3    would basically withdraw before you, you know,
4    release a statement at least.  You know, you will
5    have to talk to Mr. Young beyond that.
6        Q    Specifically with regard to the State of
7    Florida do you know when the State of Florida first
8    became aware of MBC's involvement in fraud in
9    connection with this business?
10       A    I don't know specifically.
11       Q    Would that be important in determining as
12   to whether or not it was anything Spear Safer did or
13   anything that -- that the Department of Insurance
14   did or did not do that would have been the cause of
15   the damages?
16       A    Ultimately the receiver is going to have
17   to prove his case and a trier of fact may deem
18   certain issues to be relevant.  It's just not
19   something that is part of my opinion.
20       Q    Did MBC sell policies in other states,
21   Mr. Bouchner, through either brokers or other
22   companies that it formed, where the principals
23   formed?
24       A    I'm not sure of all of the relationships
25   that the principals may have had with other

Martinez vs. Spear                                    June 4, 2007

1   companies.  I've heard things to that fact.  I don't

2   know.

3        Q    I'm not talking about the related

4   consulting companies.  I'm talking about didn't MBC

5   form -- and the principals of MBC form companies --

6   at least one company to operate in other states

7   where it couldn't obtain a license?

8        A    That's right.

9        Q    Now, if MBC could not obtain regulatory

10  blessings, let's say, to operate, did you consider

11  or plug in the scenario that MBC could have formed

12  companies to operate in other states just like they

13  did with viatical settlements?

14       A    I didn't consider that.

15       Q    Do you know what regulatory capital means

16  with respect to the statutory requirements in the

17  viatical settlements?

18       A    I presume you are referring to the amount

19  of capital that must be maintained on the books of

20  the company in order to be able to continue as a

21  licensed provider and whatever the applicable state

22  is.

23       Q    Was there a regulatory captial requirement

24  for MBC for each state?

25       A    The only reference that I have seen to

1    regulatory capital is a $200,000 amount that was

2    discussed, I believe, in Mr. Schroeder's deposition.

3         I'm not aware of any of the specific

4    issues other than the fact that certainly in the

5    early years that $200,000 number seemed to be the

6    level of capital at or about that was left in the

7    company at the end of each audit year.

8         Q    Do you know the difference between GAAP

9    capital and tangible net worth capital?

10        A    GAAP capital not specifically, no.

11        Q    And I can skip some questions on this.

12   Did any of your opinions in terms of damages have to

13   do with the amount of regulatory capital that MBC

14   disclosed to any of the states and regulatory

15   bodies?

16        A    That doesn't have anything to do with any

17   of my opinions.  The only thing that I can say to

18   address that is that if the $200,000 limit that I

19   had seen -- excuse me, minimum capital requirements

20   was indeed applicable certainly even under the

21   scenario that you had suggested before, which would

22   be any adjustment in the company's liability could

23   have put the company below that amount.  It's not

24   part of my opinions, but -- and it's not really

25   inherent in anything that I have prepared as part of

1    this report, but to the extent that that created a

2    capital issue, you know, certainly the company was

3    playing it close.

4         Q    But do you know whether that existed in

5    any of the regulatory capital requirements in any of

6    the states?

7         A    No.

8         Q    Going back to the post 1996 sales of

9    policies.  Would you agree that in those policies

10   MBC did not have the obligation to actually ever pay

11   the premiums on those policies?

12        A    MBC had to take funds at closing and put

13   those funds into this Livoti premium account for the

14   payment of future premiums.  And if a policy had no

15   premium requirement, then MBC wouldn't put any money

16   aside.

17        If the policy had a five-year premium

18   requirement as estimated by their life expectancy,

19   they would have to put that aside.  The investors

20   funds had nothing to do with the premium.  What the

21   investor paid was purely a function of the death

22   benefit.

23        So it was basically a function of two

24   factors.  What was the death benefit and what was

25   the life expectancy.  So the premiums -- whether the

1   premiums were $100,000 a year or there was a premium

2   waiver, it had no impact whatsoever on anything that

3   the investors would have paid.  Theirs was a

4   function of those two other factors.

5            So yes, I believe that under that scenario

6   or that situation MBC was putting aside money

7   because the monies that they were putting aside came

8   directly out of the net revenues or the profits that

9   they would have earned.

10      Q    I understand that they were contractually

11  obligated to put it aside from the closing proceeds.

12  I understand that, but once they do that, they don't

13  have any responsibility on those post 1996 policies

14  to pay any additional premium as they became due,

15  did they?

16           MR. MINER:  Objection to the form of that

17       question.

18      A    The fact was they never went through an

19  investor to pay those premiums.  So consequently, I

20  believe that they may not have had a contactual

21  responsibility expressly stated in the contract, but

22  the reason they continue to pay those premiums, you

23  know, would have had to consider the impact to their

24  business and what would have happened had investors

25  started getting billed for the premiums.  Probably

1    what would have happened then is exactly what is
2    happening right now.

3          Investors are up in arms because now they
4    are being obligated to continue to pay these
5    premiums on policies that are not the right life
6    expectancies.

7    Q     And in their investor documents they were
8    told they might ultimately have to pay a premium,
9    right?

10   A     They were also told that their life
11   expectancies were accurate.

12   Q     And MBC didn't provide them accurate life
13   expectancies, right?

14   A     It doesn't appear to be so.

15   Q     On the non-MBC post 1996 policies, when a
16   premium became due on, again, post 1996 policies
17   owned by the trustee, where would the money for the
18   premium -- to pay the premium come from?

19   A     Out of the closing proceeds that were
20   provided at the time the transaction was completed.

21   Q     And then once those proceeds that were set
22   aside at the time of closing to pay that premium
23   were exhausted, and then on the post 1996 policies,
24   then where would the obligation to pay the premium
25   come from?

Martinez vs. Spear

```
 1        A     Well, we discussed the waterfall so
 2   initially there was the premium waiver, then
 3   followed up by the funding that was put aside, then
 4   followed by the reserve, which would be a
 5   combination of the interest and the unused portion
 6   of the premiums that were put aside, none of which
 7   were ever tracked.  So certainly there was no
 8   reserve created for that purpose, followed by the
 9   VSI reserve, followed by the ultimate billing of the
10   purchaser.
11        Q     Did you see in any of the materials that
12   Brinkely, McNerey represented to Spear Safer that
13   there were separate reserve accounts that were in
14   existence off MBC books to pay premiums on MBC owned
15   policies?
16        A     First reference I saw to that was in
17   Mr. Haugh's report, but beyond that I'm not aware of
18   anything.
19        Q     And I'm not asking you to accept that.  I
20   am asking you in any material that you reviewed did
21   you see that?
22        A     No.  My understanding was that the only
23   premium accounts were the Livoti accounts, which
24   were for the non-MBC policies.  With one exception,
25   excuse me.  The one exception of the VSI account.
```

Martinez vs. Spear

```
1          Q     In 1997 did Spear Safer determine the
2    total amount of a reserve account over and above the
3    amount of premiums that would be due for the life
4    expectancies that were provided to the investors who
5    bought policies?
6          A     That would be Mr. Young's area.
7          Q     That is the calculation of that amount?
8          A     Yes.  He reviewed the workpapers and knows
9    exactly what was done.
10         Q     I want to ask you a general question and
11   again you tell me if this is something that is
12   germane or whether it is within your expertise.
13               In this case would a contingent premium
14   liability, would an example of it be a premium
15   liability for some amount of years that would need
16   to be calculated over and above the person meeting
17   their life expectancy?
18               That is, when someone meets their life
19   expectancy, that a contingent premium liability
20   would be some amount that is determined for a number
21   of years that that person could be expected to live
22   and that would be a contingent liability that would
23   have to be recorded on MBC's books?
24               MR. MINER:  Objection to the form of that
25          question.
```

Martinez vs. Spear

1      A     I think hypothetically if there were no
2  issues of fraud involved here, that would probably
3  be an appropriate way of viewing what should have
4  been done.
5           But when the entire transaction is called
6  into question because of the erroneous life
7  expectancies that were represented to shareholders,
8  that changes the equation because it is no longer a
9  matter of determining what the appropriate reserve
10 is because if somebody is going to live for 20 more
11 years, it would not be a viatical policy.   If
12 someone was living for seven years more, it wouldn't
13 be a viatical policy.
14      Q     What you are basically saying -- I think
15 what you said before is they were buying, in your
16 mind, something that was worthless.   They were not
17 even buying a policy.
18      A     They were not buying a viatical policy.   A
19 viatical policy was defined to investors as a policy
20 where the life expectancy was projected between one
21 year and ultimately six, but generally most of them
22 were between one and three years.
23      Q     I might have asked you this, and tell me
24 if I have, did you make any determinations as of --
25 or did Mr. Young as of 1997 or 1999 or any -- do any

Martinez vs. Spear

1  procedures which would estimate the life expectancy

2  which should have been determined for MBC owned

3  policies once people had reached their life

4  expectancies?

5      A    We did not perform that analysis.

6      Q    Is that something that can be done?

7      A    I don't know if it can right now

8  because ---

9      Q    Well, I'm not asking you to do it.  I'm

10  just asking you generally is that something that

11  could be done?

12      A    Could it be done at the time or could it

13  be done today looking backwards ten years?

14      Q    No, no ---

15      A    I don't know.  It depends on the

16  information that is available.  It depends on

17  whether the people who are alive today have any --

18  it would be the work of a specialist if it can be

19  done at all.

20      Q    Did you determine or Mr. Young determine

21  for each year beginning 1997 through 2002 did you

22  determine what MBC's contingent premium liability

23  would be for each year?

24      A    If a general understanding is that there

25  should not have been a sale and there should not

Martinez vs. Spear

```
1    have been -- we are going in circles, but it's the
2    same answer.
3         Q    Putting that aside, because I think what
4    you're saying is -- tell me if I am wrong, it is
5    really irrelevant because the fraud should have been
6    uncovered and they should have walked away before
7    that even became an issue.  That's what you're
8    telling me, right?
9         A    I'm not saying that it's completely
10   irrelevant.  I guess what I'm saying is that the
11   issue is so large that it would render much less
12   significant than other issues of what the reserves
13   should have been.
14             We have not, neither myself, nor has Mr.
15   Young calculated what the reserves should have been
16   and I don't know today whether sufficient
17   information exists that would allow for that
18   computation.
19             But certainly at the time there should
20   have been additional procedures, as I understand it,
21   that should have been done that would have addressed
22   that issue.
23        Q    And that is Mr. Young's area?
24        A    I believe so, yes.
25        Q    The investor or purchaser documents
```

Martinez vs. Spear                                      June 4, 2007

1    indicated that the trustee could use the reserve

2    funds for any reason on any policy they deem fit,

3    didn't it?

4        A    The trustee can use the reserve funds -- I

5    would like to look at the document.  I don't recall.

6        Q    In general -- and I know you are going to

7    go back and I understand what you're saying --

8    you're going to get back to the whole operation as a

9    whole, but let me just ask you this question apart

10   from that:  If in any given year the amount of

11   reserves that could be pulled out of those reserve

12   funds would offset whatever MBC's contingent premium

13   liability would be, would you agree that GAAP would

14   not require that a premium -- a contingent premium

15   liability to be recorded on their books?

16       A    I can't agree to that just because of the

17   overriding issue.

18       Q    But if there was no overriding issue,

19   let's just say everything was on the up and up here,

20   is that a true statement?

21            MR. MINER:  Objection to the form of the

22       question.

23       A    It's really outside the scope of my

24   testimony.  I am not an auditor.  I would really

25   rely on Mr. Young to provide that testimony.

Martinez vs. Spear

1    Q    The complaint refers to a Ponzi scheme

2  being operated here.  Did you make any determination

3  as an expert as to what the Ponzi scheme was?

4    A    I understand what a Ponzi scheme is.  I

5  don't have any specific opinion that this was a

6  Ponzi scheme, although I certainly see indicia of a

7  Ponzi scheme.

8        But my understanding is that when new

9  funds are being used in order to pay old obligations

10  and those old obligations were obtained in means

11  that they were in this enterprise, that would be

12  indicative of a Ponzi scheme.

13    Q    In the materials you reviewed from the

14  point of view of the opinion that you're giving did

15  you see any cases in post 1996 for trustee owned

16  policies where MBC failed to set aside or designate

17  premiums for the life expectancy that had been

18  determined?

19    A    The files that I reviewed had a life

20  expectancy, had a premium estimate and in some cases

21  there were problems with the amounts that were put

22  aside for those premiums.

23        For example, if there was an immediate

24  spike at some point within -- if there was a spike

25  at some point within the life expectancy, I did see

1    indications where the amount that was put aside was

2    merely a multiple of the current year's premium, and

3    didn't take into consideration that the policy

4    actually went out for three years hypothetically

5    there would have been a change in the premium level.

6           Q     I'm talking about at closing.

7           A     That's what I'm talking about as well.

8           Q     Did you see anything at closing where --

9    let's just say someone had a -- for post 1996

10   policies where a viator had a life expectancy for

11   three years.  Did you see any instances where MBC

12   didn't at least designate in three years of premiums

13   for that life expectancy?

14          A     I think I was being responsive.  What I am

15   saying is that I would see a calculation that would

16   multiply three times some number.  I'm just saying

17   that I did see instances where the amount, the

18   number that was identified was based on the current

19   year premium and didn't factor in known increases

20   over that life expectancy period.

21                So there were clearly instances where they

22   may have under ascribed premiums and failed to put

23   aside sufficient dollars.

24          Q     How many cases did you see that in?

25          A     Just a couple.  I didn't do a review.

Martinez vs. Spear

1    This was just looking at a handful of policies
2    looking to see what was done.  So you would see a
3    policy where it would be a ten-year level premium
4    and you are acquiring a policy in year nine and by
5    year eleven it's is going to be a big increase that
6    I saw that was not taken into consideration.  That
7    was only in one or two instances.  I really didn't
8    do a review to check that.  That was not part of the
9    scope of my work.  It was just something that I came
10   across when I was trying to understand the nature of
11   their operations.
12       Q    Is your damage theory based upon deepening
13   insolvency?
14       A    I understand what deepening insolvency is
15   and I believe that as a result of the continued
16   operations of MBC there are now -- there became ever
17   increasing claims that are now going to be brought
18   forth against the company.
19       Q    You presume.
20       A    Well, what I presume is that there are
21   certainly investors right now that will lose money
22   and will -- most of which are likely to place a
23   claim with the receivership.
24       Q    And that they will prevail?
25       A    Well, at this point I'm not aware of any

1    reason why those -- assuming the dollar amounts are

2    correct, I'm not aware of any reason why there is

3    going to be any opposition by the receivership to

4    oppose those claims.  His responsibility is to try

5    and assist investors who were taken advantage of

6    here, not to put up obstacles for them.

7              So, you know, assuming that the dollars

8    claimed are consistent with what we know them to be,

9    those claims will be allowed.

10             They may be allowed as an investment or

11   they may be allowed based on the death benefit.  But

12   there will be a claim that will be allowed.  And as

13   a result of their continuing to operate over time,

14   that base of claims grew and continued to grow.

15             Now, I'm not testifying that that meets or

16   doesn't meet the definition of a deepening

17   insolvency, but as a non-legal layperson's analysis,

18   it appears that that should be consistent with that

19   theory.

20        Q    And I should have asked you this first.

21   What is the theory of deepening insolvency?

22             MR. MINER:  Objection.  It calls for an

23             interpretation of a legal theory versus ---

24        Q    Is that a damage theory, recognized damage

25   theory?

Martinez vs. Spear

1        A    It's a theory, but there is -- I have read

2   case law that disputes exactly what deepening

3   insolvency entails so, you know, I don't have a

4   specific interpretation or a conclusion as to what

5   deepening insolvency should be.

6        Q    Before this case had you ever calculated

7   damages in relation to securities transactions?

8        A    I was involved in a case that dealt with

9   misrepresentations made to the public which impacted

10  the stock price of the security.  The damages were

11  calculated based on the amount that was paid by

12  investors relative to -- you know, based on various

13  pricing and securities based on that move or based

14  on misrepresentations.  So that was an example.

15       Q    Do you know what an event study is?

16       A    Yes.

17       Q    What is that?

18       A    Similar to what I was just describing.  An

19  event study would be that you would look at things

20  that happen over time that could impact a security's

21  price and to the extent that some event has been

22  identified that would establish damages.  You have

23  to adjust for other events that would happen -- that

24  could have contributed to that change.

25       Q    Do you agree that some alleged investor

1    losses have to do with simply the investment being

2    worth less than it should have been because of the

3    advances that have been made at least with regard to

4    the AIDS policies and the treatment of AIDS?

5        A    It's possible that there could have been a

6    factor that led to certain policies, the lives of

7    certain insureds going beyond the life expectancies.

8        Q    Let's say for an example that an accurate

9    life expectancy was actually given in a case and the

10   investor bought a policy based on that life

11   expectancy and the person continues to live three

12   years, five years, 10 years beyond that life

13   expectancy.  That loss to the investor would not

14   have anything to do, would it, with fraud on behalf

15   of MBC?

16       A    Unless of course there was fraud that

17   would have led to the shut down of the company that

18   never would have happened.

19       Q    So basically you have a kind of a but for

20   causation theory here, right?  But for the fact that

21   the company wasn't shut down there wouldn't be any

22   investor losses after either 1999 or 2001?

23       A    Yes.

24            MR. MINER:  I am going to object to the

25       form of that question.  I also think you are

1        calling for a legal conclusion.  Go ahead.
2        A    I think my report is pretty clear as to
3   what damages are based on.  If you want to call it a
4   but for theory, I mean, it does presume exactly what
5   we discussed up until this point.  That there would
6   have been some regulatory action that would have
7   either ceased or significantly diminshed its
8   capacity to continue to operate as it did.
9        Q    Are there any other factors that you
10  considered or that you would acknowledge,
11  Mr. Bouchner, that would reduce the value of the
12  investors asset, such as changes in the industry,
13  treatment of AIDS, and things like that, that would
14  affect or reduce the value of this asset other than
15  a fraudulent life expectancy?
16       A    I haven't done any analysis that tried to
17  differeniate between the various factors.
18       Q    I guess your response would be the same
19  that if there were investor losses, that certainly
20  could be attributed to those other factors that if
21  the company basically had been shut down earlier,
22  they wouldn't have even really had the chance to
23  sustain those losses because of other factors,
24  correct?
25       A    Yes.

1          MR. MINER:  Just note my objection to the

2      form of that question.

3      Q     Are you also assuming, Mr. Bouchner, that

4  if the investors didn't invest in MBC, that they

5  would not have invested in any other viatical

6  companies?

7      A     My assumption doesn't consider alternative

8  areas.  What I'm looking at is what were the damages

9  to MBC which result in claims that these investors

10 now have against MBC.  If the investors took their

11 money and lost it somewhere else, it wouldn't be a

12 claim to MBC and I wouldn't care about that.

13     Q     You have two alternative theories of

14 damage.  We discussed one of them a lot, I know.

15          The other theory is essentially damages,

16 alleged damages based upon the monies that were paid

17 out to the Steingers and their various consulting

18 companies and related parties transactions, right?

19     A     Yes.

20     Q     Now, you can't have it both, can you?

21     A     No, you can't.

22     Q     So why did you place an alternative theory

23 of damages with regard to the related party

24 distributions in alternative to the investor funds

25 theory of damages?

1        A     It was an alternative theory in order to
2    provide the tier of fact with just that, an
3    alternative in the event that it was deemed by the
4    trier of fact that the first alternative wasn't an
5    appropriate measure.
6              While I believe it is an appropriate
7    measure of damage under the assumptions that we have
8    been discussing, I wanted to provide some
9    alternative which reflects the amount of profit that
10   was taken out by the principals that comes as a
11   result of these transactions.
12       Q     On Page 8 of your report where you're
13   talking about your determination of the net
14   investment based damages, you're essentially talking
15   about damages in policies that you have designated
16   sell policies and keep policies, right?
17       A     Yes.
18       Q     Now, with regard to the sell policies, and
19   I guess what you're doing here is basically you have
20   offset the investors monies paid by some amount of
21   recovery, right?
22       A     That's right.
23       Q     Now, with regard to the sell policies, how
24   did you determine the potential investor recovery?
25       A     The sell policies have been divided up

Martinez vs. Spear

1   into two groups.  The first one is being referred to

2   internally as the Pool 1 Group and those were those

3   policies that consisted of a ratio of five percent

4   or more cash value to face value of the policy.

5          The idea was is that those policies with

6   cash value would be the most attractive to investors

7   because there is some cash inherent in the policy

8   that would be available to pay premiums.

9          So there was a stalking horse auction that

10  was conducted by the receiver in which approximately

11  $13.6 million was raised to purchase those policies.

12         And that was a relatively small premium

13  over the face value.  In spite of the notifications

14  that were put out there and the efforts made by the

15  receiver, at the end of the day there was one bidder

16  who stayed in the game and offered a premium of less

17  than one million dollars over the face value of

18  those policies and that translates into a recovery

19  to those investors of close to 15 percent.

20         The receiver is currently in the process

21  of assigning the second pool, Pool 2 policies.

22  Those are the policies most of which have no cash

23  value but some of which have between zero and five

24  percent.

25         The expectation at this point is that it

Martinez vs. Spear

1   won't get 15 percent recovery that Pool 1 did, but

2   for argument sake, I have left it at the 15 percent,

3   because it seemed to be at least a conservative

4   estimate of what those investors would likely to

5   recover at the most.

6       Q      Have we covered the keep policies yet?

7       A      That was the sell policies.

8       Q      How about on the keep policies?  How did

9   you determine the alleged net investor losses on

10  those?

11      A      The keep policies are a lot more difficult

12  primarily because we are in the process right now of

13  the initial billing of premium for all investors.

14  They make up the -- in terms of the absolute dollars

15  the lion's share of the policies that are still

16  active.

17      Q      These are the people who have not sold the

18  policies thus far and want to sell them, right?

19      A      Yeah, these are the people who upon

20  initial notification that they would have a choice

21  that I'm willing to stay in and participate and pay

22  premiums.

23            When they were told that, there was

24  limited information available to them so many of

25  those investors made that choice without necessarily

1    realizing exactly what that obligation was

2    committing them to.

3              We are currently in the process right now

4    of getting all of those investors, while monies are

5    coming in, it's very difficult to estimate how many

6    of these people are going to suffer sticker shock,

7    for lack of a better word, and drop out of the

8    process, which would result in a complete loss of

9    their investment or will continue to pay.

10             That answer will be knowable probably by

11   August or September of this year at least for the

12   initial round, and we will know how many of those

13   people are going to drop out.

14             But the initial returns, so to speak,

15   reflect a reluctance on the part of investors.  Many

16   of them are not sending in their premiums, but we

17   don't know yet.

18             So at this point I really have no way of

19   predicting what will be knowable at least with a lot

20   more certainty within the next four to six months,

21   but I assumed at least for argument sake that it

22   will be somewhere in the range of 25 to 75 precent

23   recovery.  I really can't be more specific, but

24   certainly will -- you know, that number will become

25   confirmed more with each passing month.

Martinez vs. Spear                                    June 4, 2007

```
 1        Q    What is the 25 to 75 percent estimate
 2   recovery based on?
 3        A    It's just based on the fact that I don't
 4   think that there is a possibility of 75 percent
 5   recovery, but I wanted to have a number that was
 6   high enough that would be difficult to argue, and 25
 7   percent was based on really the initial returns of
 8   those investors and those policies that were
 9   beginning to hit their due dates.
10             We had a number of policies that were down
11   around that level.  So really it represents the
12   range of possible outcomes.
13        Q    When we discussed earlier you're
14   assumption that had Spear Safer acted according to
15   GAAS they would not have been able to issue an
16   unqualified opinion and that this would have either
17   led to regulatory action, which would have either
18   caused the company to cease operations or curtail
19   their operations in all states, do you think that is
20   a reasonable assumption to make as a basis for your
21   damages?
22        A    I think that it's an assumption that's
23   based on the receiver's ability to demonstrate that
24   there would have been that regulatory action.
25             I have no expertise in the regulatory
```

1   responses that would have happened if this was -- if

2   the company just stops sending out financial

3   statements from day one for all states that required

4   them.

5           I don't know what the response would have

6   been, but ultimately my assumption or my analysis is

7   based on that.

8       Q    I understand, but if you're giving an

9   assumption as an expert, do you first have to do --

10  whether in this case or not, do you first have to

11  make a determination as to whether the assumption

12  that you're asked to make is a reasonable one given

13  all the facts?

14      A    I certainly would look to see if I could

15  determine one way or the other if it was reasonable

16  or unreasonable.  I can't make that determination,

17  but if it's not reasonable, then my analysis

18  wouldn't be relevant.

19      Q    In the SEC papers did you see any

20  breakdown as to the number of policies and the

21  amount of policies and the amount of investor funds

22  received in connection with MBC's business broken

23  down between each state?

24          MR. MINER:  Objection, vague.  The SEC

25      papers?

Martinez vs. Spear

```
 1              MR. MURPHY:  Yes.  The filings with the
 2      SEC.
 3         Q     You said you reviewed them.  You went
 4      through the complaint and exhibits that they
 5      attached.  That's what I mean.  The SEC filings.
 6      Did you see any breakdown between the states that
 7      show the total value of the policies, the number of
 8      policies and the amount of money invested in any
 9      particular state?
10         A     I may have.  I looked at the SEC filings
11      in May of 2004 and I haven't studied them since.
12         Q     In the materials that you reviewed did you
13      see whether or not during the period of time that
14      Spear Safer audited MBC's financial statements that
15      they made recommendations regarding audit
16      adjustments?
17         A     You would have to ask Mr. Young.
18         Q     Again, I just wanted to make sure.
19         A     I'm not sure on those details.
20         Q     Are you giving an opinion, Mr. Bouchner,
21      that when the fraud should have allegedly been
22      discovered by Spear Safer, whenever that was, that
23      other than walking away from the audit that they had
24      any other responsibility to report what they
25      believed to be the case to anyone else?
```

1       A    I'm not going to make any opinion in that

2    regard.

3            MR. MURPHY:  Let's just take five minutes.

4       I think I'm about done.  If you can just give

5       me five to ten minutes to look over my notes, I

6       may or may not have anything else.

7            (Recess taken.)

8            MR. MURPHY:  No further questions.

9            (Thereupon at 4:35 p.m. the deposition was

10      concluded.)

11

12                   _____

13                        Scott Bouchner

14   Sworn to and subscribed

15   before me this -----day

16   of -------, 2007.

17   Notary Public, State

18   of Florida a Large

19

20

21

22

23

24

25

Martinez vs. Spear                                    June 4, 2007

```
1                        CERTIFICATE

2

3    STATE OF FLORIDA   )

4    COUNTY OF DADE     )

5

6        I, Jill M. Kircher, a Notary Public in and for

7    the State of Florida at Large, do hereby certify

8    that, pursuant to notice in the above-entitled

9    cause, Scott Bouchner was by me first duly cautioned

10   and sworn to testify the whole truth, and upon being

11   carefully examined testified as is hereinabove

12   shown, and the testimony of said witness was reduced

13   to typewriting under my personal supervision, and

14   that the said deposition constitutes a true record

15   of the testimony given by the witness.

16       I further certify that the said deposition was

17   taken at the time and place specified hereinabove

18   and that I am neither of counsel nor solicitor to

19   any of the parties in said suit nor interested in

20   the event of the cause.

21       WITNESS my hand and official seal in the City

22   of Miami, County of Dade, State of Florida, this 6th

23   day of June, 2007.

24                        Jill M. Kircher

25                        Jill M. Kircher
```